HELEN H. MOLHOLM, CONSERVATOR OF THE ESTATE OF BRODER PAULSEN, APPELLANT, V. EZRA LYNES ET AL., APPELLEES.

178 N. W. 2d 566

Filed July 2, 1970. No. 37485.

Maupin, Dent, Kay, Satterfield & Gatz, Donald E. Girard, and Gary L. Scritsmier, for appellant.

Orie C. Adcock and Robert M. Harris, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ., and COLWELL, District Judge.

SPENCER, J.

This is an action brought by plaintiff as conservator of the estate of her uncle, Broder Paulsen, to recover $31,100, alleged to have been wrongfully obtained from her ward by the defendants, Ezra Lynes and Larry Lynes. The defendants are father and son, and will be referred to hereafter as Ezra and Larry. Broder Paulsen will be referred to as Paulsen. At the close of plaintiff's evidence, the defendants moved to dismiss plaintiff's petition and enter a verdict for the defendants and each of them. This motion was sustained and the plaintiff has perfected an appeal to this court.

Plaintiff, who is a niece of Paulsen, went to live with Paulsen's parents in 1902. The home was a sod house, approximately 10 miles north and east of Oshkosh, Nebraska. Paulsen was still living in the same house at the time he was hospitalized in 1967. The house had no modern conveniences. Paulsen, who was 83 years of age at the time of the trial, had a congenital deformity. He had no fingers or thumb on his left hand but had some fingernails at what would appear to be the end

of his wrist. He had never owned an automobile nor had a driver's license. He traveled with horse and a wagon until his last team died sometime between 1960 and 1962. After that time he was dependent entirely upon neighbors for transportation.

Ezra, who had rented a part of Paulsen's farm land, lived approximately 9½ miles east of Oshkosh and 2½ miles west of Paulsen. Larry, from 1963 to September 1966, lived in Oshkosh; from September 1966 to January 1967, he lived in Scottsbluff, Nebraska; and from March 1967, to the date of the trial he lived 11½ miles southwest of Oshkosh, and more than 20 miles from the Paulsen ranch.

In August 1967, after an absence of several years from Oshkosh, plaintiff visited Paulsen. At that time she found him very unkempt; looking old and tired; very forgetful; and repetitious. He had grown a long beard and had had no haircut for several months. Plaintiff persuaded him to change into clean clothing, and she took him into Oshkosh where he got a haircut and a shave. At that time he did not appear to be in very good health, had lost much of his strength, walked very slowly, and seemed to be very tired, with very little ambition.

Plaintiff's next visit with Paulsen was in October 1967. He had grown weaker and in walking around he would get out of breath. To her, he seemed more feeble and failing than in August, and his memory was not as good as it had been in August. Again, he had neglected to get a haircut and a shave, and consequently he again had very long hair and a long beard. The home was in very bad condition, and everything was, to use plaintiff's words, "just a mess." On the occasion of her October visit, plaintiff met Ezra. She had gone to Ezra's home to discuss Paulsen's circumstances, told him that Paulsen was not very well, and gave him her name, address, and telephone number in Denver with the request that she be contacted if any emergency should arise. Ezra

telephoned plaintiff on the evening of November 28, 1967, and advised her that her uncle had had a stroke and was in the hospital.

Paulsen's physician, who was called when Ezra brought Paulsen into Oshkosh November 27, 1967, had not seen Paulsen since April 1, 1964, when he treated him for a fungus infection. The physician testified that Paulsen was extremely dirty, was incoherent, and had suffered a cerebral vascular accident. In his opinon, Paulsen's mental condition remained static from November 1967, to the time of the trial. Paulsen was not aware of time or place, and did not comprehend things he was asked to do. He definitely did not have the mental capacity to appear and testify.

Some of the neighbors testified that Paulsen was forgetful in later years. One of them stated he had observed this condition since 1960. This neighbor told of an instance in 1966 when his bull got into Paulsen's pasture, and Paulsen had forgotten it a short time later. Another neighbor, Christensen, testified that Paulsen had been a strong willed individual until the last few years. He observed that Paulsen's health had started deteriorating by 1965, and that Paulsen was forgetful after that time. Another neighbor, Krajewski, testified that he and his brother-in-law, both of whom had helped Paulsen on previous occasions, were hired by Ezra in 1966, to put up hay for Paulsen. After the hay was put up, they allowed it to settle for 60 days and then, in Paulsen's presence, one of them measured the stacks. When they went to see Paulsen on September 18, 1966, for payment for putting up the hay, Paulsen was having one of the bad days they had heard about. He did not know who they were, nor did he know they had put up the hay. After they visited with Paulsen and showed him the hay, Paulsen had the witness make out a check which he signed. About a week later, Paulsen came over to the witness' home to inquire if he had ever settled with him for putting up the hay.

Another neighbor, Miller, testified that he was helping Ezra and Paulsen with cattle in 1963, when Paulsen got overheated. He also testified to taking Paulsen to see Ezra about 7 o'clock on a morning in 1963, because Paulsen told him he was worried about some money. When they arrived, Ezra told them he did not have time to talk. When Ezra left, Paulsen said, "* * * that was a good deal." The witness took Paulsen over to Ezra's again 2 days later, but found no one at home. About 2 days later, another neighbor, Kemmerling, came to Miller's home with Paulsen, and Paulsen said, " 'I want you to go along with I and Mr. Kemmerling to talk to Ezra Lynes.' " When they drove into the yard, Paulsen said to Ezra, " 'I want to talk to you.' " Ezra said, " 'I have got to go to work,' " and then they drove off. As they were driving away, Paulsen said, " 'It looks like I bought another combine.' " Kemmerling testified that on one occasion Paulsen had told him he had to pay Ezra for every little thing he did for him. Paulsen also told this witness that he had to let Ezra have some money. In 1962 or 1963, Paulsen asked Christensen what he thought about loaning money to Ezra, and Christensen told him that personally he would not. In 1966, when Christensen hauled some cattle for Paulsen, Paulsen showed him a check and told him that he would have to see Ezra to get paid, that Ezra would fill out the check.

Plaintiff testified that after she was appointed conservator, she attempted to straighten out her ward's affairs, but was never able to find some of the bank statements or checks for the period after February 1966, nor any of the checks issued to the defendants from December 1965, through November 1967. The November 1967, bank statement at Ezra's direction was supposedly mailed to Paulsen at the hospital but it was never found. Paulsen's banker testified that Ezra in later years usually picked up Paulsen's bank statements and canceled checks. Plaintiff did find a check for $800,

dated August 31, 1965, payable to Ezra Lynes. Because the bank photostated checks charged to its various depositors, plaintiff was able to have reproductions made of those photostats. They indicate that the following checks, in addition to the one for $800, were cleared through the ward's bank account by the defendants:

| DATE | NAME | AMOUNT |
|---|---|---|
| 12-24-1965 | Ezra Lynes | $1,000.00 |
| 1-22-1966 | Ezra Lynes | 600.00 |
| 2- 4-1966 | Ezra Lynes | 100.00 |
| 2- 4-1966 | Ezra Lynes | 100.00 |
| 2-19-1966 | Ezra Lynes | 4,000.00 |
| 3-11-1966 | Ezra Lynes | 2,500.00 |
| 4-15-1966 | Ezra Lynes | 3,000.00 |
| 10- 8-1966 | Ezra Lynes | 2,000.00 |
| 12-10-1966 | Ezra Lynes | 3,000.00 |
| 2-13-1967 | Larry Lynes | 6,000.00 |
| 2-25-1967 | Ezra Lynes | 5,000.00 |
| 8-26-1967 | Ezra Lynes | 800.00 |
| 10-16-1967 | Ezra Lynes | 300.00 |
| 10-16-1967 | Larry Lynes | 300.00 |
| 10-26-1967 | Larry Lynes | 600.00 |
| 11- 4-1967 | Ezra Lynes | 800.00 |
| 11-26-1967 | Ezra Lynes | 200.00 |

Portions of the deposition testimony of the defendants were introduced as admissions against interest. This testimony would indicate that both defendants were present on the occasions when these checks were executed. Their testimony was to the effect that Paulsen signed the checks after they had been made out by Larry, and that Paulsen put his account number on each of the checks. A comparison of writing with other checks in evidence would raise a question as to whether or not Paulsen actually wrote the account number on the checks, or whether it was inserted by one of the defendants. Defendants admit the receipt of the proceeds of the checks. The record indicates the checks

in each instance were deposited in the account of the defendant to whom they were payable.

Two disinterested witnesses, employees of the grocery store in Oshkosh, testified that it was customary procedure for Ezra to bring in blank checks signed by Paulsen to pay for groceries, and these witnesses usually filled in the checks with the date, name of the payee, and the amount of the groceries. On some occasions cash was paid for the groceries. Ezra in his deposition testified he couldn't ever recall going into the grocery store with a blank signed check. The two witnesses were very positive that this happened on several occasions. The testimony is undisputed that during the period in question Ezra got groceries from Oshkosh for Paulsen practically every week. There can be little question but that defendants on several occasions had blank checks with Paulsen's signature in their possession.

Defendants argue that as this was a law action in which a jury was waived, the judgment of the trial court has the effect of a verdict of the jury and should not be set aside unless clearly wrong. We have no quarrel with this general proposition of law. As we said in Riddle v. Erickson, 183 Neb. 122, 158 N. W. 2d 608, the judgment of the trial court in a law action has the effect of a jury verdict where a jury has been waived, and conflicts in the evidence must be resolved in favor of the successful party. This rule, however, has no application in the instant case. Defendants moved for dismissal at the close of plaintiff's case. In that situation, the rule to be applied herein is the reverse of the one contended for by the defendants. All conflicts in evidence must be resolved in favor of the plaintiff, and plaintiff is entitled to every inference which can be adduced from the evidence.

In Johnson v. Francis, 179 Neb. 342, 138 N. W. 2d 27, we said: "On a motion to dismiss, made at the close of plaintiff's case, every fact which is alleged and which the evidence tends to support will be considered as

proved." See, also, Willey v. Parriott, 179 Neb. 828, 140 N. W. 2d 652.

Plaintiff presents two basic contentions: First, the trial court should have placed the burden upon defendants to prove the validity of the checks which passed to them since they occupied a confidential relationship with plaintiff's ward; and second, if the court did not place the burden upon defendants to prove the existence of valid gifts, there was sufficient evidence of undue influence or fraud to make a sufficient prima facie case to shift to defendants the burden of going forward with the evidence.

Where the validity of an alleged gift between persons occupying a confidential relationship is attacked, the burden of proving that a confidential relationship existed between the parties rests on the one attacking the gift. When this burden is met, the burden then rests on the alleged donee to show the validity of the gift. See Krull v. Arman, 110 Neb. 70, 192 N. W. 961.

We have set out sufficient of the evidence to indicate that a confidential or fiduciary relationship did exist between Paulsen and Ezra and Larry. Sufficient certainly to require them to make a satisfactory explanation for the more than $30,000 cleared by them through Paulsen's bank account in a 2-year period. Defendants, when their depositions were taken on some of the checks, were extremely evasive as to the nature of the transaction but were certain Paulsen had given them most of the checks as gifts, usually on occasions when they suggested to him that they needed money for machinery or wanted to secure registered cattle to improve their herd.

It is not necessary to go into detail on all the various transactions, some of which they claimed were settlements for labor performed, such as the two checks for $300 in October 1967. Larry testified that he spoiled the check made payable to Ezra by writing the amount on the line for the payee and that Paulsen signed it and told him to try to clear it because it was the last check

he had. The next day Larry secured another check for the same amount payable to himself, which Paulsen signed after Larry filled it out. It is the testimony of the defendants that although the amount is in excess of the value of any services, that Paulsen wanted to pay them each $300.

Paulsen was not known as a generous man. The testimony would indicate that he was extremely penurious. So much so that he would not spend money even to improve his own living conditions. The alleged gifts were never mentioned to anyone, and apparently they always took place when the defendants had a need for money. The inference from plaintiff's evidence would indicate them at most to have been loans. No gift returns were ever made on any of the items.

Plaintiff claimed a conspiracy on the part of the defendants. This inference could be drawn from the fact that although certain of the checks were alleged gifts to Ezra, the personal property purchased with the checks was put in the name of both Ezra and Larry.

The burden of proof is on the person asserting undue influence to prove by a preponderance of the evidence: (1) That the grantor, testator, or donor was a person who would be subject to such influence; (2) that there was an opportunity to exercise such influence; (3) that there was a disposition to exercise such, influence; and (4) that the result was the effect of such influence. Parkening v. Haffke, 153 Neb. 678, 46 N, W. 2d 117. The inferences which must be accorded to plaintiff's evidence herein at the stage of defendants' motion are sufficient to meet that burden.

While great age is an important and pertinent circumstance to be considered in connection with other evidence going to the question of mental competence, it ordinarily cannot be treated as controlling. Parkening v. Haffke, *supra*. Where, however, undue influence or a breach of a confidential relationship may exist, we have a different situation. As we have said many times be-

fore, undue influence is usually surrounded by all possible secrecy. It is largely a matter of inference from facts and circumstances surrounding the individual, his life, character, and mental condition, as shown by the evidence and the opportunity afforded designing persons for the exercise of improper control. In re Estate of Farr, 150 Neb. 615, 35 N. W. 2d 489.

Here, we find a confidential relationship did exist and that defendants had every opportunity either to exert undue influence or to take advantage of a trust relationship. We also find the inferences on the state of the record herein are such that it would be so out of character for Paulsen to have materially reduced his substance by large and frequent gifts that we can reasonably infer that they were either the result of undue influence, a breach of trust, or loans.

Where, as here, the plaintiff has shown the relationship of the parties and that their dealings are such that a presumption of undue influence or a breach of trust arises therefrom, the burden of going forward with the evidence shifts to the party seeking to sustain the checks as gifts. See, Cunningham v. Quinlan, 178 Neb. 687, 134 N. W. 2d 822; Conry v. Langdon, 181 Neb. 53, 146 N. W. 2d 782; Scholting v. Scholting, 183 Neb. 850, 164 N. W. 2d 918.

The motion to dismiss was improperly sustained. The judgment of dismissal is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.