775 N.W.2d 13 (2009)
278 Neb. 727
In re Estate of Leona M. HEDKE, deceased.
John Nowak, Special Administrator of the Estate of Dolores Nowak, deceased, appellant and cross-appellee, and
Nathan A. Schneider, Conservator of Leona M. Hedke, appellee and cross-appellee,
v.
Charles Hedke, as Trustee of the Leona M. Hedke Revocable Trust, dated December 30, 2004, as attorney in fact for Leona M. Hedke, and individually, appellee and cross-appellant.
No. S-08-980.
Supreme Court of Nebraska.
October 23, 2009.
*19 J. Bryant Brooks, of Brooks Law Offices, P.C., McCook, for appellant.
Nathan A. Schneider, of Mousel & Garner, pro se.
Steve W. Hirsch, of Hirsch & Pratt, L.L.P., and Terry L. Rogers, Lincoln, of Terry L. Rogers Law Firm, for appellee Charles Hedke.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
Shortly before her death at age 92, while suffering from dementia, Leona M. Hedke created a trust. She deeded all her real estate to the trust and executed a new will that devised all her remaining property to the trust. In the trust, she left the bulk of her estate to her son, Charles Hedke, and nominal assets to her daughter, Dolores Nowak. Dolores contested the will, objecting, in part, to Charles' undue influence.
In a separate action, Dolores also sued to set aside the trust and to impose a constructive trust on assets that Charles had wrongfully taken while acting as Leona's attorney in fact. In addition, she sued to recover assets that Charles had wrongfully taken while acting as trustee of Leona's trust.
After Dolores transferred the probate action to district court, the court dismissed as time barred her claim challenging the *20 trust's validity. After consolidating the cases, the court concluded that Dolores had failed to carry her burden on two issues: She failed to show that Leona (1) lacked testamentary capacity and (2) had executed the will and quitclaim deed because of Charles' undue influence. The court found that these documents were valid. But the court found that Charles had abused his fiduciary duties both while he was attorney in fact and while he was trustee. It ordered him to pay for many unauthorized expenditures and to return assets that he had wrongfully taken.
Our holding will be spelled out with some specificity in the following pages, but briefly stated, it is this:
1. We reverse the district court's order finding no undue influence, because the evidence shows that Charles improperly influenced Leona in making her will.
2. We vacate the district court's order finding that the deed was valid and that Charles had misappropriated Leona's assets while attorney in fact, because Dolores, as a devisee, lacked standing to recover assets for the estate, so the court did not have jurisdiction over these claims.
3. We conclude that Dolores, as a trust beneficiary, had standing to challenge Charles' actions while he was trustee.
4. We remand the cause to the district court to make further findings and determinations regarding Charles' transactions during the trust's winding-up period.

II. BACKGROUND
When his father became ill, Charles moved back to the Trenton, Nebraska, area to help manage the family farm. After his father died, he and Leona agreed to split the farm expenses and income evenly, and Leona would pay the taxes. In 1993, Leona signed a will which provided that Charles would receive the farmland but compensate Dolores for her share in cash. Leona's attorney had drafted the 1993 will. In 1998, Charles took Leona to see her attorney to draw up a power of attorney naming both Charles and Dolores as her joint attorneys in fact.
Later, in December 2003, Leona was hospitalized after falling because of a seizure. While she was at the hospital, her doctor diagnosed her with dementia, and she was later admitted to a nursing home. Before entering the nursing home, Leona lived alone in Trenton, and Charles and his wife lived on Leona's farmland. Dolores lived in Arizona. After Leona entered the nursing home, Charles handled all her financial affairs.
Leona had frequently told a neighbor and Leona's sister-in-law, close friends of Leona, that she had a will. And she said that she had treated her children equally: Charles was to get the farm and Dolores was to get an equal share of Leona's estate through a cash payment from Charles. She had also discussed her will several times with her neighbor while in the nursing home and had never indicated that she wanted a new will. The record shows that Dolores and Leona were close and maintained regular contact. And before entering the nursing home, Leona equally divided her oil royalty money between herself and her children.
Even before entering the nursing home, Leona had problems with confusion and memory loss. In October 2004, after she entered the nursing home, her doctor signed a report characterizing her dementia as "[significant Alzheimer's." The same month, he sent a letter to Dolores' attorney regarding Dolores' pending conservatorship application. He stated that Leona was usually confused and disoriented and could not make decisions in her best interests regarding her health care or finances.
*21 Later, at trial, her doctor stated that on December 10, 2004the date Leona allegedly requested a new estate plan from Charles' attorneyhe believed that someone should have been overseeing her best interests. Because her condition would have only gotten worse, he believed she would have had a difficult time reading or understanding the estate planning documents that she signed on December 30, 2004. He also testified that Leona was vulnerable to suggestion and could be manipulated. He explained that she probably would have remembered who her family members were and that a person might not recognize her condition without probing because she could carry on a short conversation. Her nurses also considered Leona's cognitive abilities, short- and long-term memory, and decisionmaking to be severely impaired.
Both Leona's neighbor and Leona's sister-in-law testified that Leona was vulnerable to suggestion and that she relied upon Charles for every decision. Leona had paid off his defaulted business loan, and she had paid his child support arrears.
Charles claimed that before Leona entered the nursing home but while he was her attorney in fact, she gave him money because of his financial hardships. His wife had been unable to work since 2000 because of multiple sclerosis, his business had failed, and because of drought, the farm income had dropped. He stated that Leona would tell him to write out a check and then she would sign it. Charles admitted to keeping some of his mother's valuable items when her personal property was sold at auction; he claimed that Leona wanted him to have them. While Leona was in the nursing home, Charles also wrote himself checks from her account if he needed money. He said that he told her about the checks and that she did not object. Charles also admitted that in 2004, he cashed five of her monthly oil royalty checks and used the money for himself; he claimed that Leona had given him permission.
While Leona was in the nursing home, Dolores was being treated for terminal lung cancer but called Leona weekly and sometimes daily. Having access to Leona's financial statements, Dolores discovered that Charles was not paying the nursing home bills. Nor was he depositing farm income or oil royalty payments into Leona's account. She also discovered that Charles had written checks to himself from Leona's account. When confronted, he told Dolores he needed the money for his expenses. Dolores demanded that he account for these funds. He refused. In September 2004, she applied for an appointment of a guardian and conservator.
Dolores stated that she dismissed her first application because Leona was upset, but she had asked the guardian ad litem to further investigate, which he did. At the January 2005 hearing on Dolores' second application, the guardian ad litem reported to the court that a conservatorship was necessary. He had learned that Leona had incorrectly reported facts about her life during his first interview. He had concluded that she did not understand any specifics about her finances or assets.
In November 2004, Charles sold Leona's house and auctioned her personal property. The proceeds were several thousand dollars for the personal property and $45,500 for the house. Charles stated that he wrote a check for the full amount of the house proceeds to the nursing home to cover arrears. Yet, his 2005 accounting shows that he deposited $52,499.55 from the house and auction proceeds and paid only $22,400 to the nursing home. Dolores became concerned because large sums of Leona's money were still disappearing and because Charles had told her that Leona *22 did not have enough money to remain in the nursing home. So in November 2004, she applied again for an appointment of a guardian and conservator. Charles claims that after this filing, Leona became very upset and wanted an attorney to fight the action.
Shortly after Dolores filed the second application, Charles removed Leona from the nursing homeover Dolores' objectionsand took her to his home. At that time, Leona had $42,923 in three bank accounts. In 2004, her farm property was assessed for tax purposes at $174,630. The nursing home cost about $3,989 a month.
Leona's doctor agreed to discharge her from the nursing home after Charles assured him that he and his wife could care for Leona. Although Charles' wife was a registered nurse, she was disabled and, like Leona, needed a wheelchair. Charles used Leona's funds to pay his housekeeper for helping his wife with Leona's care and to build wheelchair ramps. Charles, his wife, and his housekeeper testified that Leona was happy living with Charles. The nursing home staff, however, was concerned about Leona's living with Charles because of her confusion and high risk for falling. Because Charles had declined all supportive services, they notified Adult Protective Services.
Just before her discharge from the nursing home, Leona told her neighbor that Charles had said Dolores was trying to steal the farm. He admitted this. He also admitted that after Dolores applied for a guardian and conservator, he began suggesting to Leona that she create a trust because it would easier for him to take care of her with a trust.

1. CHARLES ASKS HIS ATTORNEY TO REPRESENT LEONA
Charles testified that Leona had repeatedly told him that she wanted to change her will. Yet, he did not attempt to contact Leona's longtime attorney, who had drafted her 1993 will and power of attorney. He testified that in late 2004, in response to Leona's inquiry, he told her that she could discuss changing her estate plan with his attorney, Terry Rogers. He further stated that she agreed to Charles' contacting Rogers, which he did. Rogers' billing statement shows that Charles contacted him on December 2, 3 days after removing Leona from the nursing home. According to Charles, Rogers suggested a trust.
On December 10, 2004, Rogers met with Leona at Charles' house. At this time, Rogers was also representing Charles on an unrelated assault charge. Rogers knew that Dolores and Charles were Leona's joint attorneys in fact, and he knew that Dolores was concerned Charles was misappropriating Leona's assets. Rogers admitted that he knew he "might have" a conflict of interest. He was representing Charles and his wife, and Charles would benefit from Dolores' disinheritance. Charles could not remember whether he had paid Rogers for Charles' personal legal matters out of Leona's funds. Rogers stated that Leona orally agreed to waive any conflict regarding his past and present representation of Charles and his wife. He stated that he agreed to represent Leona only after Charles and his wife understood that his advice to Leona could be contrary to what they would prefer.
In contrast to Charles' statements, Rogers testified that he was not asked to meet with Leona to discuss her will. According to Rogers, he had the following discussion with Leona on December 10, 2004: While discussing the conservatorship proceeding with him out of Charles' presence, Leona asked Rogers to do some estate planning. Leona stated that she thought she had made a will, but that she *23 could not remember what it said and that she wanted a new one. On cross-examination, however, Rogers admitted Leona had told him that she did not know where the will was and that she wanted to dispose of her property as her father hadwith her son getting the land and her daughter getting the cash. Rogers advised her to create a revocable trust before a court ordered a conservatorship against her wishes. Leona was purportedly unconcerned when he explained that Dolores might receive nothing from the trust if Leona lived a long time. Leona agreed with Charles to include the farm equipment as a trust asset and agreed to convey all her farmland to the trust in a quitclaim deed.
Rogers stated that Leona knew that Charles was taking her money, but that Leona did not want him to pay it back. According to Rogers, she was dismissive of Charles' attempt to include as a trust asset any money he had borrowed. Rogers, however, insisted that the debt be included. He stated that Leona's anger at Dolores was rational because Leona did not want Charles to account for his conduct.
Both Charles and Rogers stated that Charles was not present when Rogers discussed the will and trust with Leona. And Charles claimed he could not recall whether he had talked to Rogers about the terms of the trust or will. But he admitted that Rogers had advised him a trust would be the best solution for the farm business. Charles also admitted that he participated in discussions with Rogers and Leona about a trust and that he had encouraged her to create it. Charles did not, however, explain to Leona that Dolores would likely not receive any property if Leona created the trust.
The record also shows that Charles consulted with Rogers on December 15, 2004, regarding Leona's estate plans. Apparently, this is the date when Charles told Rogers that he and Leona had agreed to include as a trust asset a $20,000 debt from Charles. This loan did not, however, include the royalty checks he had cashed, and he could not remember whether it included any "cash payments" to himself. Rogers included this "loan" as a trust asset. Charles also told Rogers that Leona had agreed to have an "old friend of Charles," a farmer in the community whom Leona "seemed to know," serve as her trustee. Rogers said that he did not speak to Leona again until December 30, when she signed the documents.
On December 16, 2004, Rogers sent a letter to Charles explaining his "possible" conflict of interest, to ensure that he and his wife did not object to Rogers' representing Leona. But he did not send a corresponding letter to Leona. Also on December 16, Charles called Rogers to say that he had found Leona's 1993 will. Charles knew that Leona had made a will because she had shown it to him in 2003 before entering the nursing home. And he knew that under that will, he was required to make a cash payment to Dolores. Charles faxed a copy of the will to Rogers. Rogers knew that the 1993 will contained a provision that either gave Dolores a lien against the property or required Charles to pay money to Dolores so that she would receive her share of the estate. But Rogers instructed Charles to shred the old will, and Rogers shredded his copy. He stated that this was his standard practice to avoid confusion between wills when a client executes a new will. Charles admitted that he had probably burned the earlier will. Neither Rogers nor Charles ever informed Leona that her old will had been found. Charles' housekeeper testified that Leona had told her she had a will but that she was executing a new one because the *24 old one was lost. Leona also told her that the new will was the same as the old one.
On Christmas 2004, Dolores spoke to Leona on the telephone. Angry, Charles called Dolores and accused her of trying to steal the farm. Leona's sister-in-law also spoke to Leona on Christmas. Leona was upset and repeated that Charles had told her Dolores was trying to steal the farm.

2. LEONA SIGNS NEW ESTATE PLAN DOCUMENTS WHILE HER COMPETENCY HEARING WAS PENDING FOR JANUARY 12, 2005
On December 30, 2004, Charles took Leona to the courthouse to review the estate plan documents and then to the bank for witnessing and notarization. Rogers stated that he left Leona alone to review the documents. He then spent 5 to 10 minutes reviewing the documents with her, including the trust provision that left Dolores only Leona's remaining personal property. He stated that Leona affirmed that this division was what she wanted. Leona signed a quitclaim deed conveying all her farm property to the Leona M. Hedke Revocable Trust. The trust named Charles' friend as trustee and Dolores and Charles as the beneficiaries. After Leona's death, the trust required the trustee to (1) pay her debts, taxes, and burial expenses; (2) distribute all real estate to Charles; and (3) distribute any remaining trust property to Dolores. Leona also signed a new will, making Dolores the residuary beneficiary. But the new will contained a pour-over provision that bequeathed all her property to the revocable trust.
Three bank employees witnessed Leona sign the documents. One of them stated that Leona was unsure whether she had reviewed the documents. But she knew who the banker and another employee were, and she told the employees she was signing the documents of her own free will. She also stated in a "disappoint[ed] tone" that she did not know what had happened to Dolores. She stated that Dolores had not been there but that Charles had stayed and helped.
All three employees reported that Leona had stated she was dividing her assets the same way her parents or father had: The sons received the real estate, and the daughters received cash and other assets. The banker stated that while he believed Leona knew what she was doing, he was worried that she was being influenced.

3. COURT ACCEPTS PARTIES' STIPULATION THAT A CONSERVATOR SHOULD BE APPOINTED
Before the hearing on January 12, 2005, the parties had signed a stipulation. They stipulated as follows: (1) Leona needed a conservator because she was unable to manage her property; (2) the court would appoint attorney Nathan A. Schneider as Leona's conservator; (3) Schneider would amend the trust to appoint Charles as trustee instead of Charles' friend; (4) the trustee would account to the conservator quarterly; (5) both Dolores and Charles would account to Schneider within 30 days for all Leona's assets that they had held, received, or transferred under their power of attorney authority from December 2003 forward; and (6) Dolores would reserve her right to contest the will and trust but would dismiss her request for a guardian. While at the courthouse, Leona amended her trust to make Charles her trustee. She also signed a codicil making Charles her personal representative. The court appointed Schneider as conservator. Schneider testified that Charles failed to file an accounting within 30 days as the parties agreed.
After Charles became the trustee, Rogers represented him in the conservatorship action and as trustee. In January 2005, Schneider met with Leona at Charles' *25 house to assess her mental capacity and explain his role as her conservator. He had arranged to meet there with an Adult Protective Services worker, but Charles refused to allow the worker in his house. Schneider stated that Leona could not follow the conversation. After being hospitalized with pneumonia, Leona died on April 4.

4. EVENTS AFTER LEONA'S DEATH
After Leona's death, Charles conveyed the trust's real estate to himself, but, on Rogers' advice, he did not distribute any personal property or cash to Dolores. He had previously opened a trust account with a beginning balance of $32,814. He did not account for Leona's assets until compelled to do so by a contempt order. And he did not reimburse the trust for the money he had paid to himself or kept, nor did he pay the trust for the outstanding $20,000 loan. In April 2005, he wrote himself a $5,000 check from the trust account to reimburse himself for Leona's rent and care he provided. The same month, he purchased a truck with trust money and titled it in his name.
Charles provided a partial accounting to Schneider in September 2005. In October, the county court issued a contempt order. In January 2006, Charles filed an accounting prepared by Rogers. But Schneider asserted that Charles still had not fully accounted for checks or provided documentation to show that his expenditures were on Leona's behalf. The record shows that Charles' accounting also did not include Leona's income that Charles had kept. In addition, Charles had written some checks for his own expenses. In January 2006, the county court found this accounting purged Charles of contempt but was still incomplete. Schneider never filed a complete accounting because Charles never fully accounted for Leona's assets.

III. PROCEDURAL HISTORY
In January 2006, Dolores filed a probate petition seeking a determination that Leona died intestate and requesting that the court appoint her as personal representative. Afterward, Charles filed a petition for formal probate of Leona's 2004 will; he requested appointment of himself as personal representative. Dolores contested his request. She objected that Leona did not have testamentary capacity and that the purported will was the result of undue influence. In April 2006, Dolores transferred the will contest to the district court.[1] At that time, the county court had not appointed a personal representative or special administrator,[2] nor had the conservator, Schneider, sought appointment as personal representative.[3]
Later, in June 2006, Dolores filed the nonprobate action, in her individual capacity. She alleged three claims: (1) Charles engaged in self-dealing while he was Leona's attorney in fact; (2) Charles exercised undue influence over Leona to get her to execute the December 2004 trust; and (3) Charles violated his duties as trustee to distribute assets to Dolores. Charles moved to dismiss the undue influence claim as time barred under Neb.Rev.Stat. § 30-3856(a)(1) (Reissue 2008). That section requires a contestant to challenge the validity of a revocable trust within 1 year of the settlor's death. The court sustained the motion.

*26 1. ALLEGATIONS AGAINST CHARLES
In February 2007, Dolores joined Schneider as a plaintiff in the nonprobate action. In March, the plaintiffs filed an amended complaint. This complaint did not contain the undue influence claim regarding execution of the trust, but it retained the claims of self-dealing and breach of fiduciary duties. They claimed that while Charles was attorney in fact, he (1) fraudulently transferred Leona's assets to himself and (2) misrepresented or concealed information which caused Leona to transfer her personal property and real estate to the trust. They also claimed that while he was trustee, his misrepresentations or concealments resulted in the fraudulent transfer of trust assets to himself. They asked the court to (1) order a full accounting of Charles' conduct while attorney in fact and trustee; (2) impose a constructive trust for the benefit of the estate; (3) set aside all real estate conveyances to the trust and all real estate conveyances executed by Charles to himself as trustee, or remove Charles as trustee and appoint a receiver; (4) award damages caused by Charles' self-dealing; and (5) award costs and attorney fees.
Charles moved to dismiss the plaintiffs' claims for an accounting, a constructive trust, restitution, and damages. He alleged that both plaintiffs lacked standing to assert claims for the estate. He asked the court to dismiss, as an attack on the trust's validity, that part of the complaint praying that transfers to the trust be set aside. He sought summary judgment on the remaining claims.

2. DISTRICT COURT'S ORDERS AND JUDGMENT
The court rejected Charles' claim that the plaintiffs lacked standing. It concluded that heirs can maintain an action to recover an estate's assets. But it dismissed the plaintiffs' request for a constructive trust on property conveyed to the trust. It also dismissed their request to set aside conveyances to the trust and the conveyances from the trust to Charles. The court concluded that these requests were a challenge to the trust's validity, which challenge was time barred. Later, however, the court reversed its decision and allowed the plaintiffs to seek a constructive trust and to set aside the deed.
Dolores died before trial, but the court admitted her deposition testimony. After a consolidated trial, the court issued an order, detailing many transactions that were made in violation of Charles' fiduciary duties while attorney in fact or trustee. The court ordered him to pay the conservator, Schneider, $14,528.58 for the fraudulent transfers Charles had made while attorney in fact. The court further ordered him to pay Leona's estate $18,138.57 for fraudulent transfers made while he was trustee. It also awarded prejudgment interest.
Regarding the constructive trust, the court found that Dolores and the conservator had proved that Charles had obtained some of Leona's personal property from the auction through constructive fraud. It also found that Charles had violated his fiduciary duties by purchasing a truck with trust assets. The court ordered Charles to return those assets to the estate. But it concluded that real estate that Leona transferred to the trust was not obtained by fraud, misrepresentation, or abuse of a confidential relationship.
Regarding the 2004 will, the court found the plaintiffs had failed to show that the deed and will were the result of undue influence or that Leona lacked testamentary capacity. The court found that Leona had validly executed the deed and will. It transferred the probate action back to county court for further proceedings. It then allowed Dolores' son, John Nowak, to represent her interests and substituted *27 him as a party. Finally, it overruled the plaintiffs' motion for a new trial in both cases.

IV. ASSIGNMENTS OF ERROR
Nowak filed a notice of appeal, and Schneider joined in the reply brief. For convenience, we will refer to Nowak and Schneider as "the appellants." The appellants assign that the court erred in (1) putting the burden of proof on Dolores on the issues of undue influence and testamentary capacity, (2) finding that Leona validly executed her 2004 will, (3) finding that Leona validly executed the 2004 quitclaim deed, and (5) failing to recover all assets proved to be fraudulently conveyed to Charles or for his benefit while he was acting as attorney in fact or trustee.
On cross-appeal, Charles assigns that the district court erred in failing to dismiss all claims brought by the appellants for lack of standing.

V. ANALYSIS

1. PROBATE ISSUES
We first address the court's judgment in the probate action.

(a) Standard of Review
Absent an equity question, we review probate matters for error appearing on the record.[4] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[5] In reviewing a judgment of the probate court in a law action, we do not reweigh evidence, but consider the evidence in the light most favorable to the successful party. And we resolve evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[6] The probate court's factual findings have the effect of a verdict, and we will not set those findings aside unless they are clearly erroneous.[7]

(b) Undue Influence
The court's order does not state its reasoning, but it found that Dolores had failed to prove Leona's 2004 will was the product of Charles' undue influence. Dolores contends that the court did not apply the proper burden of proof regarding undue influence. Relying on our decision in In re Estate of Novak,[8] she argues that the evidence established a presumption of undue influence and that Charles failed to overcome this presumption. And so she contends that the evidence established that the will was the product of undue influence.
Charles does not specifically address the court's undue influence ruling regarding the will; his brief addresses undue influence regarding only the quitclaim deed. But he argues that the court correctly found that the will and codicil were valid. The thrust of his evidence and argument at trial was that Leona created her will and revocable trust because she wanted to protect him financially and because she was upset that Dolores had initiated a conservatorship proceeding.
Before proceeding with the analysis, we set forth some general principles *28 regarding undue influence. To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence; (2) there was an opportunity to exercise such influence; (3) there was a disposition to exercise such influence; and (4) the result was clearly the effect of such influence.[9] Yet not every exercise of influence will invalidate a will.[10] Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's.[11]
But it is not necessary for a court in evaluating the evidence to separate each fact supported by the evidence and pigeonhole it under one or more of the above four essential elements. The trier of fact should view the entire evidence and decide whether the evidence as a whole proves each element of undue influence.[12] And a party seeking to prove the exercise of undue influence is entitled to all reasonable inferences deducible from the circumstances proved.[13]

(i) Presumption of Undue Influence
One does not exert undue influence in a crowd. It is usually surrounded by all possible secrecy; it is usually difficult to prove by direct evidence; and it rests largely on inferences drawn from facts and circumstances surrounding the testator's life, character, and mental condition. In determining whether undue influence existed, a court must also consider whether the evidence shows that a person inclined to exert improper control over the testator had the opportunity to do so.[14] Thus, we have recognized a presumption of undue influence if the contestant's evidence shows a confidential or fiduciary relationship, coupled with other suspicious circumstances.[15]
We have previously summarized suspicious circumstances that, when coupled with proof of a confidential or fiduciary relationship, can give rise to a presumption of undue influence. Those circumstances include: (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary.[16]
But the ultimate burden of persuasion for undue influence remains with the contestant throughout the trial.[17] We *29 have not, however, determined what quantity of proof will rebut a presumption of undue influence. In In re Estate of Novak, we stated that when a contestant's evidence gives rise to a presumption of undue influence, the burden of going forward with evidence to rebut the presumption shifts to the proponent. We stated that if the proponent's "evidence establishes there was no undue influence, the presumption disappears."[18] We also stated that the presumption of undue influence may be rebutted by proof that the testator had competent independent advice and that the will was his or her own voluntary act, or by other evidence of the circumstances surrounding the execution of the will.[19] These statements suggest that the proponent's rebuttal evidence must do more than support an opposing inference. But we also stated that "after evidence has been introduced, the presumption disappears."[20] It appears that we have made contradictory statements regarding the quantity of proof that would satisfy the proponent's burden to rebut the presumption.
Our case law on the proof necessary to rebut a presumption of undue influence is inconclusive. We have not treated every similar presumption as disappearing upon the opponent's introduction of contradictory evidence sufficient to support an opposing inference.[21] But the parties have not presented arguments on the quantity of proof issue, and we do not need to resolve this tension here. Even if the presumption of undue influence disappeared upon Charles' production of contradictory evidence, we believe the court was clearly wrong. As discussed below, under any standard of proof, the evidence overwhelmingly outweighed any evidence Charles adduced to rebut the presumption.

(ii) The Evidence Showed Both a Confidential Relationship and Suspicious Circumstances
A confidential relationship exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind.[22] Here, obviously, a confidential relationship existed. Further, as Leona's attorney in fact, Charles not only had a confidential relationship but also had a fiduciary relationship with Leona. And this fiduciary relationship required him to act solely for her benefit even at the expense of his own interest.[23]
The evidence clearly established that Leona had a history of relying on Charles in making important decisions and that she was vulnerable to his requests for financial help. After entering the nursing home, she totally depended upon him to handle her finances. The evidence showed that when she left the nursing home, she could not understand her finances and assets. Twelve days after Leona signed her 2004 willwhich was a little more than 1 month after Charles *30 had removed her from the nursing homeCharles stipulated to the following in the conservatorship proceeding: "Appointment of a Conservator is necessary because [Leona] is unable to manage her property and has property which will be wasted or dissipated unless proper management is provided due to her lack of capacity to make or communicate responsible decisions...."
Moreover, the evidence established more than a confidential and fiduciary relationship. It also showed that Charles had breached his fiduciary duties. Even before Leona became totally dependent upon him for her physical needs, he was exploiting the power of attorney and self-dealing as Leona's attorney in fact.
Further, the record is littered with other suspicious circumstances that raise a presumption of undue influence. Testimony from Dolores, Leona's physician and caretakers at the nursing home, her guardian ad litem, and her conservator, Schneider, established that Leona was impaired physically and mentally long before she was under Charles' exclusive control. Because of Charles' factual stipulations for the appointment of a conservator, he could not reasonably dispute Leona's impaired condition. Yet, despite Leona's sufficient assets to pay for her care at the nursing home and the belief of Leona's caretakers and Dolores that Leona should remain there, Charles insisted upon removing Leona to his home.
After Leona went to live with Charles, he immediately began efforts to postpone the conservatorship hearing and have her estate plan rewritten. His ongoing financial problems, his knowledge that a conservator would likely soon be appointed, and his refusal of supportive services strongly support the inference that his campaign to remove Leona from the nursing home was motivated not by his concern for Leona's best interests, but by his desire to preserve her assets for himself. Other evidence also supports this inference. Leona had never told her close friends that she wanted to change her will. And Charles and Rogers made inconsistent statements regarding Charles' purpose for initially contacting Rogers on Leona's behalf.
The evidence also supports another strong inference: Charles used his influence over Leona to turn her away from Dolores. As noted previously, Charles admitted telling Leona that Dolores was trying to steal the farm. At the time Charles was removing Leona from the nursing home, he was also influencing Leona to believe that Dolores had filed a guardianship and conservatorship application solely for personal gain. Both Leona's neighbor and Leona's sister-in-law testified that Leona was never upset with Dolores until Charles convinced her that Dolores was attempting to steal the farm. The neighbor and sister-in-law knew the parties well. Their testimony showed that Dolores and Leona had been close before and after Leona entered the nursing home. Leona's actions and statements also illustrate that she and Dolores had a close relationship before Charles removed Leona from the nursing home. Remember, Leona was dividing her oil royalty payments with both Charles and Dolores before she entered the nursing home. Even after entering the nursing home, she had repeatedly stated that she intended to divide her assets equally between her children, as her father had. Charles' manipulation and dominion infected Leona's attitude toward Dolores.
Charles and Rogers also failed to provide Leona with information that would have permitted her to compare her new estate plan with her previous intentions in her earlier will. Rogers' billing statements and Charles' testimony showed that Charles was involved in the planning of *31 Leona's new estate plan. Yet, he admitted that he did not explain to Leona that her new estate plan would effectively disinherit Dolores. Rogers told Leona that her medical expenses could deplete her cash assets if she lived a long time. But he did not discuss the money in her accounts at that time. Most important, neither Charles nor Rogers informed Leona that Charles had found her old will and that there were substantial differences.
Nor did Leona have independent legal advice from an attorney solely dedicated to her interests. Despite her age, her infirmity, and allegations of Charles' theft, Rogers did not attempt to determine whether a conservatorship might be in Leona's best interests. He admitted that he did not explain to Leona that Dolores believed Charles was misappropriating her assets. And, at trial, Charles admitted that he had used trust funds for his benefit without authorization. We note that Rogers now represents Charles in this appeal. He argued Charles' case before this court.
Rogers also failed to independently verify Leona's competency by asking her questions about her assets or speaking to her physician to determine if a guardianship or conservatorship was necessary. To the contrary, he successfully continued the competency hearing scheduled for December 15, 2004, until January 12, 2005, after Leona had executed new estate plan documents. Although Leona had told Rogers that she wanted to divide her property as her father had and that she did not know where her earlier will was, he did not verify that the differences in the new will represented her wishes. On this record, Rogers' testimony that Leona was not mentally impaired rings hollow.
The evidence was sufficient to support a judgment for Dolores if unrebutted. The evidence clearly showed that Leona was subject to Charles' undue influence and that he had the opportunity to exercise such influence. The court's finding that Charles had engaged in self-dealing while he was Leona's attorney in fact and trustee established his disposition to exercise such influence. Finally, even if Leona could have understood that she was disinheriting Dolores, the evidence showed that she would not have done so but for Charles' ability to turn Leona against Dolores.
In contrast, Charles' evidence established that Leona was unhappy at the nursing home and happy to be living with him. This evidence was intended to negate the inference that he had removed her from the nursing home to influence her to change her estate plan. But it also supported rather than negated an inference that she was susceptible to Charles' influence. Fleshed out, the testimony of Charles, his wife, and his attorney tended to support the following inferences: Leona was not close to Dolores; Leona was unconcerned about disinheriting Dolores; Leona wanted Charles to have her assets; and Leona never wanted Charles to account for funds that he had taken from her.
But Charles' self-dealing and constructive fraud punctured his credibility. And Rogers' zeal of approval failed to resuscitate it. Further, their claims that Leona was clear about how she wanted to distribute her assets were undermined because neither Charles nor Rogers told Leona about finding her 1993 will, despite evidence that she believed she was creating the same estate plan. And even the banker suspected that Leona was being influenced. Above all, the court clearly did not believe Charles or Rogers when it found that Charles had helped himself to Leona's funds as her attorney in fact. Despite the testimony that these funds were included as a trust asset in the form of a "loan," the *32 court nonetheless found the appellants had proved constructive fraud. If the testimony of Charles and Rogers was not credible on that issue, we wonder how they were nonetheless credible regarding the absence of undue influence.
While we recognize our deferential standard of review regarding the trial court's factual findings, we cannot ignore the overwhelming evidence that Leona would not have created this estate plan absent Charles' improper influence and manipulation. The record shows Charles' rushed and concerted effort to have Leona create new estate documents before the county court held a hearing on Leona's competency. Moreover, we cannot reconcile the trial court's finding of no undue influence regarding the will with its separate conclusion that Charles, as attorney in fact and trustee, had exploited his positions of trust for his own benefit both before and after Leona's death.
The district court was clearly wrong in not finding that Leona's 2004 will was the result of undue influence. So, the 2004 will was invalid and we need not reach the issue of her testamentary capacity. We next turn to the parties' arguments regarding the nonprobate action.

2. THE APPELLANTS DID NOT HAVE STANDING TO SET ASIDE QUITCLAIM DEED OR SEEK RECOVERY OF PROPERTY CHARLES MISAPPROPRIATED WHILE HE WAS LEONA'S ATTORNEY IN FACT
The appellants assign that the court erred in finding that the quitclaim deed Leona executed was valid. They argue that the court failed to address their claim that Charles fraudulently concealed information from Leona that resulted in her execution of the quitclaim deed. Specifically, they argue that Leona would not have executed the will, trust, or quitclaim deed if Charles or Rogers had informed her that Charles had found her 1993 will. On cross-appeal, Charles argues that the appellants did not have standing to seek recovery of Leona's real estate conveyed to the trust in the quitclaim deed.

(a) Standard of Review
Whether a party who commences an action has standing and is therefore the real party in interest presents a jurisdictional issue.[24] A jurisdictional issue that does not involve a factual dispute presents a question of law, which we independently decide.[25]

(b) No Exception to Standing Rule Applies
Whether the appellants' claim regarding the quitclaim deed is labeled undue influence or fraudulent concealment, it challenged Charles' conduct while he was Leona's attorney in fact before her death. But under the Nebraska Probate Code, the right and duty to sue and recover assets for an estate reside in the estate's appointed personal representative, not the devisees.[26] The code specifically provides that "to acquire the powers and undertake the duties and liabilities of a personal representative of a decedent, a person must be appointed by order of the court or registrar, qualify and be issued letters."[27]
We have previously noted that before the Legislature adopted the Uniform Probate Code, we had permitted an heir to maintain an action to enforce an obligation owed to the estate when the *33 administrator refused to act.[28] And we have recognized that there is general authority for this exception.[29] But even if the Nebraska Probate Code permits that exception, an issue we do not decide, here the problem is not a personal representative's refusal or inability to act. Instead, there is no personal representative. The Nebraska Probate Code anticipates this problem by providing for the appointment of a special administrator to administer an estate when a personal representative cannot or should not act.[30] Therefore, there is no need to recognize an exception that permits a devisee to sue on behalf of an estate. We conclude that the appellants did not have standing to recover real property for the estate because of undue influence. Similarly, they did not have standing to recover personal property from Charles for the time that he served as Leona's attorney in fact. Because they did not have standing, the district court did not have jurisdiction to decide these claims.[31] We vacate those parts of the court's order that concluded there was no undue influence in the execution of the quitclaim deed and that ordered Charles to pay for or return assets fraudulently transferred to himself while he was attorney in fact. But regarding its award to the estate for fraudulent transfers while he was trustee, the appellants have standing.

3. DOLORES HAD STANDING TO CONTEST TRUSTEE ACTIONS
We reject Charles' argument in his cross-appeal that all the claims in the nonprobate action belonged to the estate and not to Dolores. This contention is incorrect as far as it is directed to Charles' constructive fraud while he was trustee of Leona's trust. Dolores was the beneficiary of all non-real-estate property left to the trust. She clearly had standing to raise Charles' self-dealing and to seek damages, an accounting, and a constructive trust regarding Charles' duties as trustee.[32] Although the court should have ordered Charles to reimburse the trust for distribution to Dolores, instead of requiring him to pay the estate for his misappropriations as trustee, this error did not prejudice Charles and can be corrected on remand.

4. COURT'S ORDER REGARDING CHARLES' MISAPPROPRIATIONS WHILE TRUSTEE REQUIRES REMAND FOR FURTHER PROCEEDINGS
The court found that Dolores had proved constructive fraud for the transactions that are set out in its order. These transactions occurred both while Charles was Leona's attorney in fact and while he was the trustee of her trust. The court found that Dolores had proved that Charles, "using a power of attorney, made gifts to himself or made payments to others for his benefit." It further found that Charles had not shown by clear and convincing evidence that the power of attorney or Leona authorized the listed check transactions. The court then determined that any checks before Leona's date of death, on April 4, 2005, were written by Charles as attorney in fact and that any checks after her date of death were written *34 by Charles as trustee. It ordered Charles to pay the estate for the listed transactions occurring after April 4. This amount was $18,138.57. It also ordered him to return to the estate a truck he had purchased with trust assets after this date.

(a) Standard of Review
Appeals involving the administration of a trust are equity matters and are reviewable in an appellate court de novo on the record.[33] In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.[34]

(b) Start Date for Trustee Transactions
Before addressing the parties' arguments, we note that the court failed to segregate the listed transactions into attorney-in-fact transactions and trustee transactions. The scheduled trust assets included the funds in Leona's main bank account. Leona amended her trust to substitute Charles as trustee on January 12, 2005. The next day, Charles closed Leona's main account. He then opened a trust account with a beginning balance of $32,814. The trust account contained the funds that Charles was responsible for as trustee. Although Leona's will devised her remaining property into the trust upon her death, Charles did not make any disputed transactions through her other bank accounts. Therefore, the relevant start date for trustee transactions was January 12, 2005, when Charles became Leona's trustee.

(c) Parties' Contentions
The appellants assign that the court erred in failing to enter judgment against Charles for all the sums that they proved he fraudulently transferred to himself or to others for his benefit while he was attorney in fact or trustee. They list transactions in their brief that were not included in the order. They argue that because Charles was a fiduciary in both capacities, he had the burden to show that these transactions were equitable to Dolores as beneficiary. We do not address the appellants' argument regarding Charles' transactions as attorney in fact because we have already determined that they did not have standing to prosecute those claims. But we will address some of Charles' transactions as trustee. Charles argues that the appellants had the burden to prove a prima facie case of fraud. He argues that they failed to prove that the excluded transactions were gifts he made to himself. Thus, before deciding whether the court properly excluded the disputed transactions, we determine which party had the burden of proof.

(d) Burdens of Production and Persuasion Regarding Trustee's Constructive Fraud
The appellants rely on our cases dealing with an attorney in fact's self-dealing to argue that the burden was on Charles to prove that these transactions were equitable to Dolores. The rules in those cases were largely based upon fiduciary duties. An agency creates a fiduciary relationship, subjecting the agent to a duty to refrain from doing any harmful act to the principal. An agent must act solely for the principal's benefit in all matters connected with the agency, even at the expense of the agent's own interest.[35] An agent is prohibited from profiting from the agency relationship to the detriment of the *35 principal. Also, an agent is prohibited from having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the principal.[36]
In the attorney-in-fact cases, we were also concerned about the potential for fraud when a fiduciary has broad powers to control another person's property. We have stated that the policy concern underlying the law is primarily focused on the potential for fraud that exists when an agent acting under a durable power of attorney has the power to make gifts, especially after the principal becomes incapacitated.[37] Because of these concerns, we have held that a party establishes a prima facie case of fraud by showing that an attorney in fact used the principal's power of attorney to make a gift of the principal's assets to himself or herself or to make a gift to a third party with a close relationship to the attorney in fact.[38] Whether the fiduciary acted in good faith or had actual intent to defraud is immaterial; when these circumstances are shown, the law presumes constructive fraud.[39] What is significant is that the burden of going forward with evidence then shifts to the fiduciary to establish by clear and convincing evidence that (1) the transaction was made under the power expressly granted in the instrument and the clear intent of the donor and (2) the fairness of the transaction.[40]
It is correct that we have not applied these constructive fraud rules to the fiduciary relationship between a trustee and beneficiary. But like a power of attorney, a trust creates a fiduciary relationship regarding property. "A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation."[41] And "[a] trustee shall administer the trust solely in the interests of the beneficiaries."[42] This provision of the Nebraska Uniform Trust Code (Nebraska UTC) is patterned after the corresponding provision of the Uniform Trust Code,[43] which, in turn, is taken from the Restatement (Second) of Trusts.[44]
The Restatement comments set forth the same underlying fiduciary principles regarding trusts that we have applied in attorney-in-fact cases. A trustee "is under a duty not to profit at the expense of the beneficiary and not to enter into competition with him without his consent, unless authorized to do so by the terms of the trust or by a proper court."[45] "The trustee violates his duty to the beneficiary... where he uses the trust property for his own purposes."[46] The Restatement (Third) of Trusts rule is even more *36 explicit: It adds that "[e]xcept in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."[47] And because trustees have great control over the beneficiaries' property interests and beneficiaries cannot readily terminate their fiduciaries or dispose of their interests, "[t]he duty of loyalty is, for trustees, particularly strict even by comparison to the standards of other fiduciary relationships."[48] Beyond abstaining from self-dealing, a trustee "must refrain from placing himself in a position where his personal interest or that of a third person does or may conflict with the interest of the beneficiaries," even if the trustee has not profited by a transaction.[49]
The above principles are codified in § 30-3867. That statute allows a beneficiary to void any conflict-of-interest transaction unless a listed exception applies.[50] As in agency relationships, trusts also raise policy concerns regarding the potential for self-dealing. Like incapacitated principals in an agency relationship, trust beneficiaries often have inferior knowledge about a transaction. Trust beneficiaries also have a limited ability to protect their interests absent the trustee's full disclosure or court approval.[51]
The same fiduciary principles and policy concerns about the potential for fraud are present in a trust relationship. Accordingly, we will apply to trustees the same common-law rules that we have applied to attorneys in fact. So unless an exception under § 30-3867 applies, a beneficiary establishes a prima facie case of fraud by showing that a trustee's transaction benefited the trustee at the beneficiary's expense. The burden of going forward with evidence then shifts to the trustee to establish the following by clear and convincing evidence: The transaction was made under a power expressly granted in the trust and the clear intent of the settlor; and the transaction was in the beneficiary's best interests.
We emphasize, however, that because these rules are prompted by the concern for self-dealing, they apply only when a beneficiary shows the trustee benefited from a transaction at the beneficiary's expense. We recognize that under § 30-3867, a beneficiary could also show a breach of duty by proving that the trustee's conflict of interest affected a transaction, even if the transaction did not involve self-dealing.[52] But not every circumstance involving a conflict of interest would impose the same burden on the trustee to produce clear and convincing evidence that the transaction was authorized by the trust.[53] And showing a fiduciary relationship alone does not establish constructive fraud. Constructive fraud is the breach of a duty arising out of a fiduciary or confidential relationship.[54]

(e) Applying the Rules to the Disputed Transactions
The court's order did not include the specific transactions that the appellants *37 complain about. Generally, however, when a trial court clearly intends its order to serve as a final adjudication of the rights and liabilities of the parties, the order's silence on requests for relief can be construed as a denial of those requests.[55] And so, we consider whether the court properly denied relief for the disputed transactions after January 12, 2005, the date Charles became the trustee.
Many disputed transactions concern Charles' claimed expenditures for Leona's care, for which he failed to provide records. Other transactions are deposits for farming income, for which he failed to provide records showing that he equally split the income between himself and the trust. These transactions may or may not have benefited Charles. But because Charles failed to fully account for his management of the trust property, the appellants could not prove that these disputed transactions benefited Charles.
As trustee, Charles had a duty to keep adequate records of the administration of the trust and to promptly respond to a beneficiary's request for information related to the administration.[56] And a failure to keep such records is reason, among other things, for a court reviewing a judicial accounting to resolve doubts against the trustee.[57] But the appellants have not assigned as error that the court failed to order an accounting. And on this record, we cannot say that the appellants established a prima facie case of fraud regarding many transactions. The record does show, however, that at least four excluded transactions occurring after Leona's death benefited Charles at Dolores' expense.
On direct examination, Charles admitted to making his personal car insurance payment out of trust funds. He also admitted that he had paid the full amount of three crop service billsfor $5,039.26, $999.22, and $1,211.26out of the trust fund. Even assuming that continued farming operations were legitimately required to preserve the trust property until he distributed the assets, his failure to pay for half of these farming expenses with his own fundsas agreed uponclearly benefited him. It also depleted the trust property allocated to Dolores. The court would have undoubtedly benefited from the same type of list the appellants have provided to us on appeal. But the court's failure to include at least half of these crop service payments in its order would require reversal even if the trust authorized farming operations past Leona's death. The postdeath transactions, however, raise issues that the parties have not directly arguedwhen did the trust terminate and what was Charles authorized to do past the termination date?

(f) Trust Terminated on Leona's Death
Under the trust, Charles was required to hold and invest all trust property for Leona's benefit, during her lifetime, and to pay its principal or income for her support, needs, and care. Upon Leona's death, he was required to take the following actions: (1) pay Leona's outstanding debts, taxes, and expenses, and trust administration expenses; (2) distribute any specific devises Leona had made; and (3) distribute the trust's real estate to himself and "any and all remaining trust property" to Dolores. As noted, Charles distributed the real estate to himself in *38 September 2005. We assume that he has yet to wind up the trust pending this appeal. But while the Nebraska UTC permits a trustee to retain a reasonable amount of assets to pay these winding-up costs, it requires a trustee to distribute trust property to the designated beneficiaries upon the termination or partial termination of a trust:
Upon the occurrence of an event terminating or partially terminating a trust, the trustee shall proceed expeditiously to distribute the trust property to the persons entitled to it, subject to the right of the trustee to retain a reasonable reserve for the payment of debts, expenses, and taxes.[58]
The Nebraska UTC also defines the termination of the trust: "[A] trust terminates to the extent the trust is revoked or expires pursuant to its terms, no purpose of the trust remains to be achieved, or the purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve."[59]
Leona's trust did not contain a termination clause, but a trust's termination date can be implied from its terms.[60] Here, the terms imply that the trust terminated with Leona's death, not the end of the winding-up period, because this is when her beneficial interests in the trust ended.[61] And providing for her care and support was the only purpose for establishing the trust.[62] Obviously, paying the outstanding debts, taxes, and expenses upon her death was not the purpose of her trust. This interpretation is consistent with Restatement provisions[63] and the Nebraska UTC provisions. Instead, a trustee's payments for the settlor's outstanding debts, taxes, and expenses are part of the trustee's winding-up duties after a trust terminates.
So after the trust terminated, Charles, as trustee, continued to have a nonbeneficial interest in the trust for timely winding up the trust and distributing its assets.[64] But after a trust terminates, a trustee's property management powers are limited to those that are reasonable and appropriate in preserving the trust property pending the winding up and distribution of assets.[65] The court made no finding that Charles' continued farming operations were necessary to preserve trust property.
Also, under the Nebraska UTC, a trustee's duty to pay the settlor's debts, expenses, and taxes does not normally justify a trustee's failure to make distributions. Even assuming continued farming operations were necessary, Charles must also demonstrate that some realistic complication prevented him from determining in a timely manner a reasonable sum to *39 reserve for winding-up costs.[66] If not, then he breached a duty of care when he unduly delayed distributions.[67]
Finally, a trustee has a duty of impartiality in administering trust property,[68] which duty plays particular importance in distributing assets.[69] Even if continued farming operations were necessary, the court also made no finding that Charles reasonably paid for farming expenses with only Dolores' trust property without making any adjustments in the assets allocated to himself.[70] Nor did it find that he reasonably held back only the trust property allocated to Dolores to pay debts, expenses, and taxes. Because Charles was both trustee and beneficiary, a breach of his duty of impartiality in making trust expenditures would also be a breach of his duty of loyalty. Without these determinations, we cannot effectively review Charles' post-termination transactions.
In sum, the court should permit Charles to charge the trust for farming operations only if two conditions are satisfied: (1) The farming operations were reasonably necessary to preserve the trust property and (2) Charles did not charge the trust for farming operations past the time when he should have reasonably made distributions. If these conditions are met, the court should further determine whether Charles breached his duty of impartiality in making trust expenditures and, if so, the appropriate remedy.
Regarding the remaining transactions, the appellants have not argued how they constituted constructive fraud, and we have concluded that the record fails to support such contentions. But because this is the first time that we have pronounced some of the posttermination rules for trustees, we believe the parties should have an opportunity to argue their application on remand. We remand for further proceedings as the district court determines are necessary for that purpose.

VI. CONCLUSION
We conclude that the district court was clearly wrong in not finding that Charles had improperly influenced Leona to create a new will. But because the county court had not appointed a personal representative or special administrator before Dolores transferred the case to the district court, neither she nor the conservator had standing to set aside the quitclaim deed or transactions that Charles made as attorney in fact. We vacate those parts of the court's order that found no undue influence in procuring the quitclaim deed and that required Charles to pay for unauthorized expenditures or to return property he took while he was attorney in fact.
We remand for further proceedings regarding Charles' farming transactions after the trust terminated on Leona's death. First, the court should determine whether continued farming operations were reasonably necessary to preserve the trust property. If so, under his preexisting agreement, Charles was still personally liable for half of the farming expenses for trust property incurred during the winding up of the trust's administration. If farming *40 operations were not reasonably necessary, then any payment made for farming operations past the date of Leona's death breached his duty of loyalty not to benefit at a beneficiary's expense. Second, the court should determine whether Charles' failure to expeditiously determine a reasonable amount of trust property to reserve for debts, taxes, and expenses was justified by some unusual property or tax complication. Finally, the court must determine whether Charles breached his duty to impartially administer and distribute trust property. If the court finds that Charles beached any trustee duties regarding farming operations past the termination date of the trust, it must further determine the appropriate remedy.
REVERSED AND VACATED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] See Neb.Rev.Stat. § 30-2429.01(1) (Reissue 2008).
[2] See Neb.Rev.Stat. § 30-2457 (Reissue 2008).
[3] See Neb.Rev.Stat. § 30-2654(e) (Reissue 2008).
[4] See In re Estate of Cooper, 275 Neb. 322, 746 N.W.2d 663 (2008).
[5] In re Estate of Lamplaugh, 270 Neb. 941, 708 N.W.2d 645 (2006).
[6] See id.
[7] See id.
[8] In re Estate of Novak, 235 Neb. 939, 458 N.W.2d 221 (1990).
[9] See, In re Estate of Wagner, 246 Neb. 625, 522 N.W.2d 159 (1994); In re Estate of Novak, supra note 8.
[10] In re Estate of Peterson, 232 Neb. 105, 439 N.W.2d 516 (1989).
[11] See In re Estate of Novak, supra note 8.
[12] See In re Estate of Price, 223 Neb. 12, 388 N.W.2d 72 (1986), citing Andersen v. Andersen, 177 Neb. 374, 128 N.W.2d 843 (1964).
[13] Pruss v. Pruss, 245 Neb. 521, 514 N.W.2d 335 (1994); In re Estate of Villwok, 226 Neb. 693, 413 N.W.2d 921 (1987).
[14] See In re Estate of Villwok, supra note 13.
[15] See, e.g., In re Estate of Novak, supra note 8.
[16] See id.
[17] See, McGowan v. McGowan, 197 Neb. 596, 250 N.W.2d 234 (1977); In re Estate of Goist, 146 Neb. 1, 18 N.W.2d 513 (1945); In re Estate of Hagan, 143 Neb. 459, 9 N.W.2d 794 (1943).
[18] See In re Estate of Novak, supra note 8, 235 Neb. at 942, 458 N.W.2d at 224 (emphasis supplied), citing Loomis v. Estate of Davenport, 192 Neb. 461, 222 N.W.2d 369 (1974).
[19] In re Estate of Novak, supra note 8.
[20] See id. at 947, 458 N.W.2d at 227, citing McGowan, supra note 17.
[21] See, Crosby v. Luehrs, 266 Neb. 827, 669 N.W.2d 635 (2003); Molholm v. Lynes, 185 Neb. 707, 178 N.W.2d 566 (1970); Cunningham v. Quinlan, 178 Neb. 687, 134 N.W.2d 822 (1965); Muse v. Stewart, 173 Neb. 520, 113 N.W.2d 644 (1962).
[22] See Schaneman v. Schaneman, 206 Neb. 113, 291 N.W.2d 412 (1980).
[23] See Archbold v. Reifenrath, 274 Neb. 894, 744 N.W.2d 701 (2008).
[24] See Burnison v. Johnston, 277 Neb. 622, 764 N.W.2d 96 (2009).
[25] Id.
[26] See Neb.Rev.Stat. §§ 30-2464(c), 30-2470, and 30-2476 (Reissue 2008).
[27] Neb.Rev.Stat. § 30-2403 (Reissue 2008).
[28] See Beachy v. Becerra, 259 Neb. 299, 609 N.W.2d 648 (2000), citing Prusa v. Everett, 78 Neb. 250, 113 N.W. 571 (1907).
[29] See Beachy, supra note 28. See, also, Hampshire v. Powell, 10 Neb.App. 148, 626 N.W.2d 620 (2001).
[30] See § 30-2457.
[31] See Citizens Opposing Indus. Livestock v. Jefferson Cty., 274 Neb. 386, 740 N.W.2d 362 (2007).
[32] See Neb.Rev.Stat. §§ 30-3812, 30-3890, and 30-3891 (Reissue 2008).
[33] In re Trust Created by Isvik, 274 Neb. 525, 741 N.W.2d 638 (2007).
[34] See id.
[35] See Crosby, supra note 21.
[36] Id.
[37] Id.
[38] See, Eggleston v. Kovacich, 274 Neb. 579, 742 N.W.2d 471 (2007); Crosby, supra note 21. See, also, First Colony Life Ins. Co. v. Gerdes, 267 Neb. 632, 676 N.W.2d 58 (2004) (discussing case law).
[39] See Eggleston, supra note 38, citing Crosby, supra note 21.
[40] See, Eggleston, supra note 38; Crosby, supra note 21.
[41] Restatement (Second) of Trusts § 2, comment b. at 6 (1959).
[42] See Neb.Rev.Stat. § 30-3867(a) (Reissue 2008).
[43] See Unif. Trust Code § 802, 7C U.L.A. 588, comment (2006).
[44] Restatement (Second), supra note 41, § 170(1).
[45] Id., comment a. at 364.
[46] Id., comment l. at 369.
[47] Restatement (Third) of Trusts § 78(2) at 93-94 (2007).
[48] See id., comment a. at 94.
[49] George T. Bogert, Trusts § 95 at 341 (6th ed. 1987). See, also, Unif. Trust Code, supra note 43.
[50] See § 30-3867.
[51] See Bogert, supra note 49, § 95.
[52] See Unif. Trust Code, supra note 43.
[53] See, § 30-3867(e) through (g); Bogert, supra note 49, § 96.
[54] See Crosby, supra note 21.
[55] See D'Quaix v. Chadron State College, 272 Neb. 859, 725 N.W.2d 558 (2007).
[56] See Neb.Rev.Stat. §§ 30-3875 and 30-3877 (Reissue 2008).
[57] See Restatement (Third), supra note 47, § 83, comment a(1).
[58] Neb.Rev.Stat. § 30-3882(b) (Reissue 2008).
[59] Neb.Rev.Stat. § 30-3836(a) (Reissue 2008).
[60] See, Thorson v. Nebraska Dept. of Health & Human Servs., 274 Neb. 322, 740 N.W.2d 27 (2007); In re Trust Created by Hansen, 274 Neb. 199, 739 N.W.2d 170 (2007); Restatement (Third) of Trusts § 61 (2003).
[61] See Neb.Rev.Stat. § 30-3830 (Reissue 2008).
[62] See, Restatement (Third), supra note 60, comment b.; Restatement (Third), supra note 47, § 89, comment a.
[63] See, Restatement (Second), supra note 41, § 344; Restatement (Third), supra note 47, § 89.
[64] See, Restatement (Third), supra note 60, § 42, comment b.; Restatement (Third), supra note 47, § 89.
[65] See, Neb.Rev.Stat. § 30-3881(26) (Reissue 2008); Restatement (Third), supra note 47, § 89, comment d.
[66] Compare Restatement (Third), supra note 47, § 89, comment b.
[67] See Neb.Rev.Stat. § 30-3869 (Reissue 2008). See, also, Restatement (Third), supra note 47, § 89, Reporter's Note comment e.
[68] See, Neb.Rev.Stat. § 30-3868 (Reissue 2008); Restatement (Third), supra note 47, § 79.
[69] See Restatement (Third), supra note 47, § 89, comment e(2).
[70] See § 30-3881(22).