IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE ESTATE OF MURPHY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF MARILYN M. MURPHY, DECEASED.

PATRICK C. MURPHY, APPELLANT,
V.
ELAINE R. CLEMENS, PERSONAL REPRESENTATIVE OF THE ESTATE
OF MARILYN M. MURPHY, DECEASED, APPELLEE.

Filed February 4, 2014.    No. A-12-1001.

Appeal from the County Court for Holt County: JAMES J. ORR, Judge. Affirmed.

George H. Moyer, of Moyer & Moyer, for appellant.

Boyd W. Strope, of Strope & Gotschall, P.C., L.L.O., for appellee.

IRWIN, PIRTLE, and BISHOP, Judges.

BISHOP, Judge.

Patrick C. Murphy (Murphy), the surviving spouse of Marilyn M. Murphy, the decedent, appeals from an order of the county court for Holt County denying his petition to surcharge Elaine R. Clemens, the personal representative of the estate. Clemens is the business partner and significant other of the decedent's ex-husband, Arthur "Butch" Emme. Murphy alleges Clemens breached her fiduciary duty to the estate by directing payment of $22,448.22 to Arthur for services he rendered to the estate in connection with preparing and transporting the estate property to be sold at public auction. Murphy also alleges that Clemens failed to collect and sell all of the estate's personal property. Finding no error appearing on the record, we affirm.

BACKGROUND

Prior to her death on May 7, 2008, the decedent and her family were engaged in a ranching operation in Holt County, Nebraska. The decedent's estate included several interests in

real property, cattle, farm equipment, and other items of personal property used in the ranching operation.

The decedent was survived by Murphy and their two children, Jenna Murphy and Matthew Murphy. The decedent was also survived by two children from her previous marriage to Arthur, Curtis Emme and Christyl Kelly (Christyl).

The decedent executed a holographic will dated June 30, 1993, the same day she and Murphy married, dividing her estate equally between Murphy and all her children at that time: Curtis, Christyl, and Jenna. Her son Matthew was born subsequent to her execution of the will.

On June 23, 2008, Christyl (the decedent's adult daughter from her prior marriage to Arthur) filed an "Application for Informal Appointment of Personal Representative in Intestate." On September 22, Christyl filed a renunciation of her right to appointment and nominated Clemens to be the personal representative. On the same date, the registrar issued a "Statement of Informal Probate," in which it declared that the decedent's holographic will was valid and appointed Clemens as the personal representative of the decedent's estate. Nothing in our record indicates that any interested party challenged Clemens' appointment.

In September and October 2008, Clemens obtained two different evaluations of the fair market value of one parcel of the decedent's real property located in O'Neill, Nebraska, which the parties refer to as the "alley house." On November 14, Murphy executed a handwritten acknowledgment that Clemens was going to sell the alley house for $7,500 on December 1. Arthur purchased the alley house property from the estate for $7,500.

On January 12, 2009, Clemens filed an inventory of the property owned by the decedent at the time of her death. According to the inventory, the decedent owned interests in four separate parcels of real estate in Holt County, valued at a total of $165,373.52. The decedent owned a full interest in one parcel of real property (the alley house purchased by Arthur noted above), two undivided one-half interests in two parcels, and an undivided one-third interest in the fourth parcel. The inventory valued "Other Miscellaneous Property" at $28,148; stocks and bonds at $1,297.90; mortgages, notes, and cash at $2,384.67; and listed no mortgages, liens, or encumbrances. The total value of the decedent's estate was listed as $197,204.09.

On January 26, 2009, Murphy petitioned for an elective share of the augmented estate under Neb. Rev. Stat. § 30-2317 (Reissue 2008), and also separately petitioned for a share for the pretermitted child, Matthew, which petitions the court granted in a journal entry dated July 28.

On July 27, 2009, Clemens filed an amended inventory, adding "Cattle & Horse" sold July 9 for $2,477.25 and including $50,819.57 in mortgages, liens, and encumbrances, which were not previously identified in the initial inventory. The amended inventory listed the total value of the decedent's estate at $199,681.34.

On October 9, 2009, Murphy filed a complaint to partition in kind the three remaining parcels of real estate in which the decedent held partial interests. A public auction was held on April 9, 2010, to sell these three tracts of real estate. Clemens hired Robert Litz, a real estate broker, to advertise and conduct the auction. According to Litz, the auction was well attended and there was active bidding on the property. Arthur purchased all three tracts at the public auction for $371,200, which included all of decedent's partial interests in those tracts. In a June 15 journal entry, the court noted it confirmed the partition sale in a separate order. In a

September 3 order, the court divided the residue of the proceeds from the real estate sale among the decedent's heirs.

On April 16, 2010, Murphy filed a motion seeking the court to require Clemens to inventory and collect all of the decedent's personal property and to advertise and conduct a sale prior to May 15. On June 15, Clemens filed a report regarding the personal property of the estate. Clemens' report stated that she and her attorney personally inspected and inventoried the personal property of value owned by the decedent and that Mike Tasler of Tasler Auction Service appraised the value of the property at $7,560. The report attached Tasler's inventory of the estate's salable personal property and his values given to each item. Tasler's inventory included a John Deere 4230 tractor worth $2,000 in "salvage" condition and a John Deere 4010 tractor worth $1,000. The report stated that Arthur, who had purchased the decedent's real estate at public auction, offered to purchase all personal property on his real estate for the full appraised value of $7,560. Clemens sought an order from the court authorizing her to sell the personal property to Arthur for $7,560. On June 16, Clemens filed an "Amended Motion for Sale of Personal Property," seeking authorization from the court to sell personal property remaining on the decedent's farm to Arthur for $3,500.

On July 16, 2010, Christyl submitted an offer to purchase the personal property for $10,000, but an agreement could not be reached about the removal and cleanup of the personal property from Arthur's land.

On July 19, 2010, Murphy filed an objection to the sale of personal property to Arthur because the offer was not a fair and reasonable amount and the price was not established on an open market basis. On August 9, the court found that it was in the estate's best interest to sell the estate's personal property at a public auction, to be conducted by Tasler.

On September 24, 2010, Clemens filed a motion to reconsider the sale of personal property, claiming that Arthur had resubmitted a bid to her to purchase the personal property for $7,560, the full amount appraised by Tasler. Clemens stated she accepted Arthur's offer because she believed a private sale provided substantially more value to the estate than a public auction due to the very poor condition of the personal property and Tasler's appraisal. Clemens requested the court to vacate its order for public sale of the property and to confirm the sale to Arthur for $7,560.

On September 27, 2010, Christyl filed a motion seeking the court to compel Clemens to sell the estate's personal property through Tasler Auction Service. On October 25, the court dismissed Clemens' motion to reconsider, continued Christyl's motion to compel, and ordered Clemens to begin identifying, locating, and gathering all subject personal property so that an auction could be properly scheduled and held.

On November 12, 2010, a public auction to sell the estate's personal property was conducted by Tasler Auction Service at Tasler's auction lot in Atkinson, Nebraska. Arthur testified he cleaned, repaired, removed, and transported the personal property to Atkinson and submitted a bill for $22,448 to Tasler. The personal property sold for $28,016.50 at the auction, and Tasler paid Arthur's bill from the proceeds upon Clemens' direction. Murphy testified he attended the auction and purchased a few items.

On April 14, 2011, Murphy filed a petition to surcharge Clemens as the personal representative and the Tasler Auction Service. In his petition, Murphy alleged that Clemens had

an intimate relationship with Arthur and that she committed fraud and damaged the estate due to her conflict of interest by (1) selling the decedent's real property to Arthur at a private sale without prior court approval, (2) hiring Arthur to move certain items of personal property on the real estate to Atkinson to be sold at public auction by Tasler Auction Service, and (3) not accounting for several items of personal property Murphy alleges remained on the decedent's real property.

A 2-day trial on Murphy's petition to surcharge was held on June 15 and 16, 2012. At the end of the first day of trial, the court, on its own motion, raised a concern relating to the pleadings and inquired as to the precise issues the parties were litigating. On the second day of trial, counsel for Christyl made an oral motion to amend the pleadings to conform to the evidence presented, which the court granted. According to a July 24 journal entry by the court, the four issues litigated in addition to the pleadings were as follows: (1) whether or not the alley house was undersold by the personal representative; (2) whether or not the decedent's "rural house," in which Murphy lived until it burned down on December 24, 2009, should have been insured and the value of the house charged against the personal representative; (3) whether or not the personal representative should be required to repay to the estate and/or Murphy for personal property not accounted for or sold; and (4) whether or not the personal representative should be surcharged the sum of Arthur's bill in the amount of $22,448.50 for charges that he billed the estate in preparation of Tasler's auction.

On September 24, 2012, the court entered an order denying Murphy's petition to surcharge, finding that Clemens did not breach her fiduciary duties to the estate. Murphy subsequently filed this appeal, contesting only the court's findings with respect to two of the four issues tried: (1) Clemens' failure to sell all personal property and (2) payment of Arthur's bill. The court's findings will be discussed further below as relevant to the instant appeal.

TRIAL TESTIMONY AND EVIDENCE

*Patrick C. Murphy.*

Murphy testified about the several items of the decedent's personal property he believes were not properly sold. Murphy testified that the decedent had several vehicles at the time she passed away. He testified that on the decedent's real property purchased by Arthur there was a 1983 Ford Ranger pickup in the shed and a blue 1979 sedan on the property. Murphy testified there was a gray and silver 1986 Ford F-150 pickup on Arthur's property and a 1999 Ford Explorer at "Doug Wendell's place." Murphy testified Doug Wendell told him Clemens put a "hold" on the 1999 Ford Explorer through the estate and would not release it to Murphy. Murphy testified there was $10,000 in drill bits in a tackle box in the Ford F-150 pickup. Exhibit 41 shows that the title to the 1986 F-150, the 1983 Ford Ranger, the 1979 sedan, and the 1999 Ford Explorer were jointly titled in the decedent and Murphy's names.

Wendell was called to rebut Murphy's testimony about the 1999 Ford Explorer. Wendell testified the 1999 Ford Explorer had been at his place for 3½ years. Murphy paid for its repairs after hitting a deer, but never returned to pick it up. Wendell testified that it was "crammed full" of tools, school supplies, and clothes and that over the years, Murphy's kids have stopped by to retrieve items from it. He testified that he never told Murphy that Clemens had put a hold on it.

He testified that a storage cost of $5 per day for 3½ years would be greater than the vehicle's value.

Murphy testified there were 26½ acres of the decedent's hay on the land at the time the decedent passed. He also testified there were "maybe a couple hundred bales of wheat straw" not consumed by the cows before they were sold and 15 big round bales of straw by the house that were 2 to 3 years old. Murphy described lumber that he had accumulated on the property and, separately, some cedar lumber he had purchased "after high school." Murphy also described 200 to 300 various types of fenceposts that were not sold. Murphy submitted exhibit 42 containing 230 items of personal property that he believes Clemens did not account for. Several items were marked by Murphy as being "only his," and several items were duplicates.

Murphy testified that he used the 4230 tractor, listed as "salvage" by Tasler, on a regular basis and that it had new tires on the front and back. He also testified that the 4010 tractor had been overhauled. Murphy submitted pictures of the real estate depicting various items of property on the real estate he believes should have been sold, including two wagons, bags of rolled corn and assorted feed, saddles (one which he purchased prior to his marriage to the decedent), various gates and portable panels, a chute, a John Deere 111 lawnmower, large bales of hay, and a basketball pole and blackboard.

*Elaine R. Clemens.*

Clemens testified that she visited the decedent's real property on August 4, 2008, and took pictures of what Murphy said was the decedent's personal property that was to be sold. Based on what Murphy showed her, Clemens made her determination as to what to show Tasler for his selection to be sold. She testified that Murphy stated most of the property in the sheds was his or junk and "not to worry about it," which is what Clemens testified she did. Murphy testified he did not recall this conversation. Clemens testified that from the decedent's passing in May 2008 until the sale of the ranch in April 2010, Murphy had access to the premises to remove his own property. Clemens testified Arthur did not take possession of the real estate until June 9, 2010.

On May 15, 2010, Clemens testified that she and Tasler did a "walk-around" of the decedent's real estate and that Clemens showed him the equipment on her list and the salable property. Clemens testified the general condition of the property was that it had been sitting for a long time and that "[the] place was just trashed." She testified nothing was in operable condition, including the two John Deere tractors. Clemens testified that the green John Deere tractor was "total junk," had flat tires, a ripped seat, and had not been started in 5 to 6 years.

According to Clemens' testimony, she sold the personal property to Arthur in June 2010 and accepted his $7,560 check. Arthur thought he owned all the personal property and began fixing some items, moving equipment around, and cleaning and fixing the tractors.

As noted above, the court subsequently ordered a public auction to be conducted. Clemens testified she was concerned with the cost of having an offsite sale because fuel was $4 per gallon. Clemens had discussed with a John Deere dealership about using their truck and men to transport the personal property. The dealership priced it at $5.50 per mile for use of the truck, "plus the trucking to Atkinson." Clemens was also concerned with the amount of money it would cost to remove property from the trees, grass, and dirt. She was concerned she would have to pay

men $15 to $18 an hour for 6 weeks, purchase insurance (which only was available "by the year" for $4,000), and pay workers' compensation, Social Security, and state and federal taxes, which came to an "atrocious amount of money."

Clemens testified some of Murphy's items he claimed were unaccounted for, like "fruit jars," would be "cost ineffective recyclables" because the amount of time and money needed to clean and transport them to the auction would cost more than what they could bring at an auction. Clemens testified she was trying to adjust the value for the heirs to what would yield the most money for them. Clemens testified she does not believe the estate contains any more salable personal property.

Clemens testified that once Arthur purchased the estate's real property in April 2010, he did not want an auction to occur on the property. According to Clemens, Tasler hired Arthur to move the personal property to Tasler's auction lot in Atkinson. Clemens testified she prepared the bill on Arthur's behalf for his services. Clemens testified she prepared Arthur's bill using the amount of time he expended, the amount of equipment that he had hauled, the mileage from "point A to point B," the time he took off of work, and the amount Arthur paid in hired help.

*Arthur "Butch" Emme.*

Arthur was married to the decedent from August 18, 1972 or 1973, until they divorced in January 1991. Murphy offered into evidence exhibit 80, the property settlement agreement from Arthur and the decedent's divorce, stating to the trial court that it could infer that the property in the property settlement is what the decedent needed to operate the ranch and "probably" would have been replaced or repaired as it was needed. The trial court sustained Clemens' relevancy objection to exhibit 80.

Arthur testified that he joined Clemens and Tasler on their "walk-around" of the decedent's real estate in the spring of 2010. He testified the 4230 tractor was in poor condition, had flat front wheels, and was missing sheet metal. Arthur testified he did not tell Tasler that the 4230 or 4010 tractors were salvage.

Arthur testified that between June 18 and October 13, 2010, he believed he owned the personal property after Clemens accepted his check. He testified he had the 4230 and 4010 tractors inspected in order to determine what was wrong with them and what it would take to fix them.

Arthur testified that Tasler hired him to move all the personal property from the ranch to the auction site. Arthur submitted an itemized bill to Tasler dated November 15, 2010. Arthur's total bill was for $22,448.50, which included his mileage, 280 man hours from hired help, excavation and mowing, and cleaning and storing the 4230 and 4010 tractors. Arthur testified he kept reasonably accurate records on his time and the costs he incurred after Tasler's request to prepare and deliver the property for sale. Arthur charged $85 per hour for cleaning and detailing the 4230 and 4010 tractors, which is the rate that he charges in his body shop. Arthur stated he moved a total of 48 pieces of equipment to Tasler's auction lot.

Arthur explained that his bill for excavator work and mowing was the cost to remove machinery into which trees had grown, including an old combine, a hay cage, a mower, and an old B John Deere tractor with a mower on it. Arthur testified he initially tried to use a tractor with rubber tires to move some items, but punctured a tire. In his determination and years of

experience in towing and getting property out of wrecks, he believed using an excavator was the best way to move the machinery.

*Robert Litz.*

Clemens hired Litz to sell the decedent's real estate at public auction. He testified that it was known that he would sell anything attached to the property, including buildings, a submersible well, fencing panels, and hanging gates. Litz testified he visited the real estate. He observed a field of old hay miles west of the building, which had not been farmed for "quite some time." In Litz' opinion, the condition of the real property would be considered "a mess." He testified that there was a lot of debris, metal, and broken things lying around the yard. In Litz' opinion, the outbuildings contributed no value in their condition. He would agree that to clean up the buildings would be a liability to the buyer. Litz testified that the buyer, Arthur, delayed closing because the former owner's personal property was not all off the land.

*Mike Tasler.*

Tasler owns a livestock market and an auction service. He has been in the auction business for 26 years. He testified Clemens called in the spring of 2010 and wanted him to look at some personal property in O'Neill located on the decedent's real estate. Clemens gave Tasler a preliminary list of personal property for potential sale, but he also inspected other items to determine whether they were worth the time and expense to sell. When shown Murphy's list of personal property contained in exhibit 42, Tasler testified he does not remember seeing "a lot" of the items listed. Tasler testified he went through all the buildings and does not recall seeing stacked lumber. Tasler also went to look at equipment located off the real estate.

Tasler described the real estate as "really rough" with "stuff laying all over." He testified the site would have taken a while to clean in order for it to be conducive to an auction. In Tasler's opinion, the salable property on the decedent's real estate was not readily movable, including equipment with trees grown into it, and there was "a lot of work to do."

Arthur accompanied Clemens and Tasler on their "walk-around" of the property. Tasler testified Arthur told him one tractor needed motor work. Tasler testified the other tractor "was obvious it wasn't in good shape." Tasler recalls the 4230 tractor was about a 2 on a scale of 1 to 10 when he first saw it, and probably an 8 when he sold it at the auction. He testified he "couldn't believe it was the same tractor" and that it had greatly improved value for the sale. Tasler testified he advertised the tractors as salvage because he did not know they were going to be fixed up by the time the advertisement came out. The 4230 tractor ultimately sold for $8,700, and the 4010 tractor sold for $3,900.

Tasler testified that Clemens was his point of contact and that he left it to her to get the equipment moved to his auction lot. When Tasler was told that Arthur testified Tasler hired him, Tasler replied that both Arthur and Clemens were there when they talked about hiring Arthur, so "I don't know which one--I guess you'd say it either way." Tasler testified Clemens directed him to pay Arthur's bill from the auction proceeds. With regard to Arthur's bill for detailing the tractors, Tasler testified he paid $90 an hour to have a tractor detailed in Atkinson and believes John Deere is the same price. Tasler could not gauge whether Arthur's bill was reasonable because Tasler did not know all the hours Arthur put in.

*Mark Durre.*

Murphy called Mark Durre to testify as to his opinion of the value of the 230 items of personal property Murphy believes were not sold. Durre is an auctioneer and real estate agent in Holt County. He conducts or helps with 20 to 25 auctions a year, most of which are farm machinery and equipment auctions.

Durre reviewed the list of 230 items contained in exhibit 42 and handwrote values next to each item. The values Durre provided were not based on his personal inspection, but, rather, on his knowledge of what similar items were selling for on sales in the O'Neill area at the time. Durre was not informed of the condition of the items and valued them with the assumption that the items were in somewhat usable to medium condition. Durre testified his values certainly could be lower if the items were in poor to very poor condition. Durre questioned whether some items were duplicates, but nevertheless valued them.

Durre testified he could not value several items because there was not enough information for him to put a price on them. For example, Durre testified he did not value "$10,000 worth of drill bits" because drill bits would not bring value at an auction, nor did he know how many drill bits existed or what condition they were in.

Durre also testified as to rates he has used for transporting sale items from a person's property to his consignment lot in preparation for offsite auctions. Durre testified his rate is approximately $3 a loaded mile, if the seller provides the loader, but it is approximately $50 an hour for the loader. He bills approximately $10 to $15 an hour to a client if he hires men. Durre was hesitant to give an estimate of the cost to transport the estate items sold at Tasler's auction from the decedent's real estate to the auction lot, a distance of about 37 miles. He estimated that a 32-foot trailer might take 15 loads. Durre testified that there are too many variables without seeing the property to estimate what it would have taken to prepare and bring in the estate auction items, without personal inspection.

Durre also testified that he has detailed tractors for a consignment sale auction and charged approximately $20 an hour. He estimated he could do the work in about a day.

*Curtis Emme.*

Curtis is the son of Arthur and the decedent. He lived on the decedent's real estate as a child and has been back to visit the property over the years. Curtis testified he has never seen the lumber or fenceposts that Murphy claims are unaccounted for. Curtis testified that there were "maybe 35" straw bales in the fields, but they were "old junkie bales" that cows got into and were not in good shape. Curtis testified there are "a lot" of things on Murphy's list of 230 items that he believes did not exist.

## ASSIGNMENTS OF ERROR

Murphy assigns as error, summarized and restated, that (1) the trial court erred by not admitting as evidence the property settlement agreement from the decedent's 1991 divorce, (2) the trial court utilized the incorrect burden of proof at trial by failing to apply ordinary trust principles to Clemens' conduct, (3) the trial court erred by finding Clemens sold all the personal property belonging to the estate, and (4) the trial court erred by approving Clemens' payment of Arthur's bill.

## STANDARD OF REVIEW

Absent an equity question, appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2008 & Cum. Supp. 2010), are reviewed for error on the record. See *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Dueck*, 274 Neb. 89, 736 N.W.2d 720 (2007).

In reviewing a judgment of the probate court in a law action, we do not reweigh evidence, but consider the evidence in the light most favorable to the successful party, and we resolve evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *In re Estate of Hedke, supra*. The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Id.* An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings. *Id.*

On questions of law, the appellate court reaches its own conclusions independent of those reached by the lower court. See *In re Guardianship & Conservatorship of Larson*, 270 Neb. 837, 708 N.W.2d 262 (2006).

## ANALYSIS

*Exclusion of 1991 Property Settlement.*

Murphy argues that the trial court erred by excluding from evidence the property settlement agreement from Arthur's and the decedent's 1991 divorce, finding it was not relevant. Murphy argues that Clemens made the exhibit relevant because she testified that in August 2008, when she first inspected the decedent's real property with Murphy, "[m]ost of what was there was the large equipment that was the ranch equipment that came . . . to [the decedent] through the divorce decree." Murphy argues that the property settlement agreement would have provided a baseline from which the trial court could have understood what Clemens meant.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007). The exercise by the trial court of its discretion in ruling on the admission or rejection of evidence will generally not be reviewed by an appellate court, unless it is clearly or plainly shown that the trial court abused its discretion. *In re Estate of Camin*, 212 Neb. 490, 323 N.W.2d 827 (1982). Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 2008).

Under the Nebraska Probate Code, a personal representative must file an inventory of property owned by the decedent at the time of death. § 30-2467. The trial court heard the testimony of Tasler, Murphy, Curtis, and Clemens regarding the personal property on the decedent's real estate at or near the time of her death, including the large equipment Clemens referenced in her testimony. The trial court sustained Clemens' relevancy objection to the admission of the property settlement agreement, stating that it did not see how what the decedent

owned in 1991 was relevant to what she owned on the date of her death 17 years later. We agree. The trial court did not abuse its discretion in excluding the 1991 divorce decree.

*Burden of Proof.*

Murphy claims the trial court erred by failing to apply ordinary trust principles to the conduct of the personal representative. Murphy argues that, using ordinary trust principles, Clemens would have had to show by clear and convincing evidence that her handling of the estate and acquiescence in payment of Arthur's charges were "perfectly fair, in good faith, and at arms [sic] length." Brief for appellant at 22.

A personal representative is a fiduciary. § 30-2464(a). If the personal representative's exercise of power concerning the estate is improper, "the personal representative is liable to interested persons for damage or loss resulting from breach of his fiduciary duty to the same extent as a trustee of an express trust." § 30-2473.

Although Nebraska has not specifically addressed the burden of proof required to surcharge a personal representative for breach of his fiduciary duties, other courts have placed the burden on the party seeking a surcharge to show that the representative failed to meet his or her duty of care. See, e.g., 31 Am. Jur. 2d *Executors and Administrators* § 848 at 598 (2012) ("[p]arties seeking a surcharge have the burden of proving that the representative failed to meet his or her duty of care"); 34 C.J.S. *Executors and Administrators* § 1024 at 833 (2009) ("[o]rdinarily, the party seeking to surcharge an executor bears the burden of showing a failure to meet the required standard of care"). The placement of the initial burden of proof on the party seeking to surcharge a personal representative is consistent with Nebraska law that requires a plaintiff to prove that a defendant's breach of fiduciary duty caused the plaintiff damages and the extent of those damages. *McFadden Ranch v. McFadden*, 19 Neb. App. 366, 807 N.W.2d 785 (2001). Similarly, "'When a plaintiff brings suit against a trustee for breach of trust, the plaintiff generally bears the burden of proof.'" *In re Rolf H. Brennemann Testamentary Trust*, 21 Neb. App. 353, 368, 838 N.W.2d 336, 346 (2013) (quoting Restatement (Third) of Trusts § 100, comment *f.* (2012)).

Murphy equates Clemens' conduct to fraud, which he maintains places the burden of proof on Clemens. A beneficiary establishes a prima facie case of fraud by showing that a trustee's transaction benefited the trustee at the beneficiary's expense. *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). Only then does the burden of going forward with evidence then shift to the trustee to establish by clear and convincing evidence that the transaction was made under a power expressly granted in the trust and the clear intent of the settlor and that the transaction was in the beneficiary's best interests. See *id.* These rules are prompted by the concern for self-dealing and only apply when a beneficiary shows that the trustee benefited from a transaction at the beneficiary's expense. *Id.* Not every circumstance involving a conflict of interest would impose the same burden on the trustee to produce clear and convincing evidence that the transaction was authorized by the trust. *Id.* And showing a fiduciary relationship alone does not establish constructive fraud. *Id.*

Initially, we note that there is no indication that the trial court did not apply ordinary trust principles in finding that Clemens did not breach her fiduciary duties or on what party the court placed the burden of proof. However, after our review of the record, we find the court had

sufficient evidence to conclude that Murphy did not meet his initial burden of proof to show that Clemens' transactions benefited Clemens at the estate's expense. See *In re Estate of Hedke, supra*. And, as discussed further below, the court's decision that Clemens did not breach her fiduciary duties with respect to selling the estate's personal property and paying Arthur's bill is supported by the evidence on the record.

*Failure to Collect All Personal Property.*

Murphy argues that Clemens did not "promptly liquidate the personal property." Brief for appellant at 19. Although this argument is less than clear, we assume Murphy is referring to his assignment of error regarding the trial court's finding that Clemens did not breach her duty to collect and sell the estate's personal property.

A personal representative is under a duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will and the Nebraska Probate Code, and as expeditiously and efficiently as is consistent with the best interests of the estate. § 30-2464(a). An action to surcharge a personal representative may be brought to recover losses to the estate for an alleged breach of fiduciary duty by the personal representative. *Line v. Rouse*, 241 Neb. 779, 491 N.W.2d 316 (1992). The measure of damages is the monetary damage to the estate caused by the personal representative's breach of fiduciary duties. *Id.*

Pursuant to § 30-2476(11), a personal representative may properly abandon property when, in the opinion of the personal representative, it is valueless, is so encumbered, or is in a condition that it is of no benefit to the estate. Both Clemens and Tasler testified they inspected the decedent's real estate, including the buildings, to evaluate what items were worth the time and expense to sell. Tasler testified that although Clemens provided him with a preliminary list, he also independently determined what items were worth selling. Tasler described the real estate as "really rough," and he recalled seeing equipment with trees grown into it. Clemens likewise testified that the general condition of the property was that it appeared as if it had been sitting for a long time, "nothing was in operable condition," and the place was "trashed." Similarly, Litz described the property as "a mess" and testified that a field of hay appeared as if it had not been farmed for "quite some time."

Clemens testified that in her opinion, she had sold all the items worth selling. She stated items like "fruit jars" would cost more to fix and bring to auction than they were worth. Under § 30-2476(11), Clemens was authorized to properly abandon property when, in her opinion, the property was valueless or in a condition that is of no benefit to the estate. According to the above testimony of Clemens and Tasler, the personal property was in poor condition and they selected all the items worth selling. And, notably, Clemens submitted Tasler's inventory of personal property to the court, the court ordered Tasler to conduct a public auction, and no interested party objected to the contents of Tasler's inventory or requested that the inventory be supplemented. A personal representative shall not be surcharged for acts of administration of distribution if the conduct in question was authorized at the time. § 30-2464(b).

Additionally, Murphy did not provide competent evidence to show the amount to which Clemens should have been surcharged, even had the court determined Clemens breached her duty. Murphy submitted as evidence a list of 230 items he believes were not accounted for, but did not testify as to any of the items' value. Murphy's only evidence regarding the items' value

came from the testimony of Durre, who did not personally inspect the items and did not know their condition. Durre could not value several of the items because there was not enough information for him to put a price on them. Durre testified he assumed the items were in a usable, medium condition, but his values would be lower if the items were in poor condition. Further, Murphy's testimony indicated that many of the items were "only his," duplicates, purchased prior to his marriage to the decedent, or held in his and the decedent's name in joint tenancy, which would not be part of the decedent's estate. A personal representative's fiduciary duty does not permit, much less require, the personal representative to take possession of property that does not lawfully belong to the estate. *In re Estate of Rosso*, 270 Neb. 323, 701 N.W.2d 355 (2005).

When reviewing a decision of the probate court, the appellate court does not reweigh the evidence and must consider the evidence in the light most favorable to the successful party, who is entitled to every reasonable inference available from the evidence. *In re Estate of Lamplaugh*, 270 Neb. 941, 708 N.W.2d 645 (2006). After our review of the record, we conclude the trial court's decision that Clemens did not breach her duty to dispose of the estate's property is supported by competent evidence and is not arbitrary, capricious, or unreasonable. See *In re Estate of Dueck*, 274 Neb. 89, 736 N.W.2d 720 (2007).

*Reasonableness of Arthur's Bill.*

Murphy next argues that Clemens breached her fiduciary duty to the estate by ordering Tasler to pay Arthur's bill from the proceeds of the auction. The trial court found that there was no testimony to indicate Arthur's bill was excessive.

The propriety of employment of any person by a personal representative and the reasonableness of the compensation of any person so employed may be reviewed by the court. § 30-2482(1). Any person who has received excessive compensation from an estate for services rendered may be ordered to make appropriate refunds. *Id*. Factors to be considered as guides in determining the reasonableness of a fee include the following:

> (a) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the service properly;
> (b) The likelihood, if apparent to the personal representative, that the acceptance of the particular employment will preclude the person employed from other employment;
> (c) The fee customarily charged in the locality for similar services;
> (d) The amount involved and the results obtained;
> (e) The time limitations imposed by the personal representative or by the circumstances;
> (f) The nature and length of the relationship between the personal representative and the person performing the services; and
> (g) The experience, reputation, and ability of the person performing the services.

§ 30-2482(2). The burden is on the party challenging the reasonableness of a fee to show excessive compensation in a claim brought under § 30-2482. *In re Estate of Wagner*, 253 Neb. 498, 571 N.W.2d 76 (1997).

According to the testimony of Tasler, Clemens, and Arthur, the personal property was in poor condition. Tasler testified that there was "a lot of work to do" and that the salable property was not readily movable, including equipment with trees growing into it. Arthur testified about

- 12 -

the work he completed to prepare the personal property for auction and that he kept reasonably accurate records on his time and costs. His bill included 30 trips from "home place to Atkinson," which was 37 miles, at a rate of $5.50 per mile, for a total of $6,105; "10 trips to home place," which was 23 miles at a rate of $2.50 per mile, for a total of $575; "30 trips load & secure" at $100 an hour for $3,000 total; 280 man hours at $18 an hour, for a total of $5,040; 5 excavation hours for $750; "4 [hours] tractor [with] mower" at a rate of $85 an hour for a total of $340; $850 for "loader use"; $200 for "[h]aul out [and] return"; $2,250 to clean, store, and haul the 4230 tractor; $2,040 to clean, store, and haul the 4010 tractor; $350 to remove a dozer blade from the 4230 and a "Roader" from the 4010; and $93.50 for "[s]traw bale load." Arthur testified he moved a total of 48 pieces of equipment to Tasler's auction lot. Arthur charged $85 per hour for cleaning and detailing the 4230 and 4010 tractors, which is the rate that he charges in his body shop. Tasler testified he has had a tractor detailed for $90 an hour.

Tasler testified he observed equipment on the decedent's property with trees growing into it. Arthur explained that his bill for excavator work and mowing was the cost to remove machinery into which trees had grown.

Tasler testified to the improvement in value of some of the items of personal property. Tasler testified that the 4230 tractor was about a 2 on a scale of 1 to 10 when he first saw it and that it was probably an 8 when he sold it at the auction. He testified he "couldn't believe it was the same tractor" and that it had greatly improved value for the sale. The 4230 tractor that Tasler initially valued at $2,000 ultimately sold for $8,700, and the 4010 tractor Tasler valued at $1,000 sold for $3,900.

Murphy called Durre to testify as to the unreasonableness of Arthur's bill. Durre testified that there were too many variables without seeing the property sold at Tasler's auction to estimate what it would have taken to prepare and bring in the estate auction items, without personal inspection. Durre was also hesitant to give an estimate of the cost to transport the estate items sold at Tasler's auction from the decedent's real estate to the auction lot, a distance of about 37 miles. He estimated that a 32-foot trailer "might" take 15 loads. Durre testified that his rate to transport items to auction is approximately $3 a loaded mile, if the seller provides the loader, but it is approximately $50 an hour for the loader. He bills approximately $10 to $15 an hour to a client if he hires men.

In its order, the trial court concluded that the evidence presented at trial showed that because of the condition of the personal property and because of the conditions of the premises where the items sat, a considerable amount of time and labor was necessary to prepare for auction. The trial court found that there was no testimony that the amount paid to Arthur was excessive. After our review of the record, we find no error in the court's conclusion.

## CONCLUSION

Finding no errors appearing on the record, we affirm the trial court's denial of Murphy's petition to surcharge the personal representative.

AFFIRMED.

- 13 -