See, also, Neb. Rev. Stat. § 43-106.01 (Reissue 2008) (when child shall have been relinquished by written instrument, as provided by Neb. Rev. Stat. §§ 43-104 and 43-106 (Reissue 2008), to DHHS or to licensed child placement agency and agency has, in writing, accepted full responsibility for child, "the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child"). Accordingly, Jesse's attempt at revoking his relinquishment was invalid.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's finding that Jesse relinquished his parental rights to Zoey through a validly executed relinquishment and that his attempt at revocation of said relinquishment was invalid.

AFFIRMED.

———————————

IN RE ESTATE OF JOHANNA M. MORRELL, DECEASED.
DAVID THOMPSON AND KATHLEEN THOMPSON, COPERSONAL
REPRESENTATIVES OF THE ESTATE OF JOHANNA M.
MORRELL, DECEASED, AND MARCELLA NAU ET AL.,
APPELLEES, v. LEE LORENZ, APPELLANT.
___ N.W.2d ___

Filed September 16, 2014.    No. A-13-568.

1. **Summary Judgment.** Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
2. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all favorable inferences deducible from the evidence.
3. **Summary Judgment: Proof.** The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law.
4. **Summary Judgment: Evidence: Proof.** After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at

trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.

5. **Summary Judgment.** If a genuine issue of fact exists, summary judgment may not properly be entered.

6. **Wills: Undue Influence: Proof.** To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence; (2) there was an opportunity to exercise such influence; (3) there was a disposition to exercise such influence; and (4) the result was clearly the effect of such influence.

7. **Wills: Undue Influence.** Not every exercise of influence will invalidate a will.

8. ____: ____. Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's.

9. **Undue Influence: Proof.** It is not necessary for a court in evaluating the evidence to separate each fact supported by the evidence and pigeonhole it under one or more of the four essential elements for showing undue influence. The trier of fact should view the entire evidence and decide whether the evidence as a whole proves each element of undue influence.

10. ____: ____. A party seeking to prove the exercise of undue influence is entitled to all reasonable inferences deducible from the circumstances proved.

11. ____: ____. One does not exert undue influence in a crowd. It is usually surrounded by all possible secrecy; it is usually difficult to prove by direct evidence; and it rests largely on inferences drawn from facts and circumstances surrounding the testator's life, character, and mental condition.

12. **Wills: Undue Influence: Presumptions: Proof.** In determining whether undue influence existed, a court must consider whether the evidence shows that a person inclined to exert improper control over the testator had the opportunity to do so. Thus, a presumption of undue influence exists if the contestant's evidence shows a confidential or fiduciary relationship, coupled with other suspicious circumstances.

13. ____: ____: ____: ____. Suspicious circumstances, when coupled with proof of a confidential or fiduciary relationship, can give rise to a presumption of undue influence. Those circumstances include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary.

Appeal from the County Court for Douglas County: Lawrence E. Barrett, Judge. Affirmed.

Gerald D. Johnson, of Johnson & Pekny, L.L.C, for appellant.

Mallory N. Hughes and Stuart Dornan, of Dornan, Lustgarten & Troia, P.C., L.L.O., for appellees David Thompson and Kathleen Thompson.

Steven J. Riekes and David P. Wilson, of Marks, Clare & Richards, L.L.C., for appellees Marcella Nau, Frida Brohan, and Edmund Roessler.

Moore, Pirtle, and Riedmann, Judges.

Pirtle, Judge.

## INTRODUCTION

Lee Lorenz appeals from two orders of the county court for Douglas County. The first is an order finding that a will executed by Johanna M. Morrell in March 2011 was of no force and effect. The trial court found there was no genuine issue of material fact in regard to whether the March 2011 will was the result of Lorenz' undue influence and granted partial summary judgment in favor of Marcella Nau, Frida Brohan, and Edmund Roessler, Johanna's siblings, and of David Thompson and Kathleen Thompson, the copersonal representatives of Johanna's estate under a September 2010 will. The second order from which Lorenz appeals is an entry of summary judgment in favor of the siblings resulting in the dismissal of Lorenz' objection to probate of Johanna's September 2010 will. For the reasons that follow, we affirm both orders of the county court.

## BACKGROUND

Lorenz befriended an elderly couple—Johanna and her husband, Wilson Morrell—in approximately 2007. Wilson was ill at the time, and Lorenz drove Johanna back and forth to see Wilson while he was in a hospital, skilled nursing care, and later, hospice care. Lorenz also made changes to the couple's home to make it handicapped accessible for Wilson so he could be released from skilled nursing care and live at home. As Wilson's health continued to decline, Lorenz helped the Morrells with their financial affairs and in completing their tax returns. Wilson died in November 2009. After Wilson died, Lorenz continued to assist Johanna with various matters.

Lorenz contends that he regarded Johanna as a second mother and that she treated him like a son.

Johanna and Wilson had one son, who predeceased them both. Johanna had three living siblings, namely Nau, Brohan, and Roessler. The three siblings all lived on the east coast and had visited Johanna only twice in the 40 years prior to her death, the last time being in September 2010. On September 13, 2010, Johanna executed a will leaving her property to her siblings, the only family she had.

Johanna began showing some signs of dementia in 2009. On October 28, 2010, Lorenz filed a petition for appointment of a guardian-conservator, requesting that he be appointed guardian-conservator for Johanna. The petition was prepared and submitted by Ralph E. Peppard, an attorney in Omaha. On the same day, the Department of Health and Human Services, Adult Protective Services (the Department), also filed a petition for appointment of a guardian-conservator based on its investigation regarding Johanna's finances' being taken advantage of and her inability to protect herself. The Department requested that Mark Malousek, an attorney, be appointed as Johanna's guardian-conservator. The Department also filed an objection to the appointment of Lorenz as Johanna's guardian-conservator because the Department was investigating Lorenz for the financial exploitation of Johanna. Malousek was appointed temporary guardian-conservator on October 28 and was appointed permanent guardian-conservator in April 2011.

On March 11, 2011, Johanna executed another will, this time leaving her entire estate to Lorenz. Johanna died in January 2012, at the age of 84.

On January 25, 2012, the Thompsons, as copersonal representatives of Johanna's estate under her September 2010 will, petitioned for the probate of the September 2010 will. Lorenz filed an objection to probate of the will.

On February 9, 2012, Lorenz petitioned for the probate of Johanna's will dated March 11, 2011. Johanna's siblings and the Thompsons objected to the probate of that will.

On March 14, 2013, Johanna's siblings filed a motion for partial summary judgment asking the court to declare the

March 2011 will invalid and of no effect. The motion alleged that the will was invalid because at the time it was executed, Johanna was under guardianship and lacked the capacity to make the will as propounded, and because the will was the product of undue and unlawful influence by Lorenz, who manipulated Johanna into signing an instrument which left all of her possessions to him upon her death.

A hearing was held on the motion for partial summary judgment. The evidence presented by the siblings and copersonal representatives showed that in March 2009, Johanna's physician, Dr. Heather Morgan, diagnosed Johanna with "mild cognitive impairment," and that by October 2009, her memory had declined and testing showed that she most likely had "dementia of the Alzheimer's type." In September 2010, Morgan indicated that "[d]ue to [Johanna's] functional and cognitive impairments, she is unable to make informed decisions about her general over all well being and health." Morgan recommended that a guardian-conservator be appointed on Johanna's behalf. Morgan opined that Johanna had lacked decisionmaking capacity since October 2009.

In October 2010, Johanna underwent a neuropsychological evaluation done by Dr. Nadia Pare which confirmed a diagnosis of "[d]ementia, possible Alzheimer's disease etiology, very mild severity." Pare concluded that Johanna had the capacity to make her own medical and financial decisions, but found her to be a vulnerable adult, at risk of being financially exploited, "given . . . Lorenz' emotional manipulation described by [Johanna] and by her current [power of attorney]." Pare testified at the guardianship proceedings that Lorenz had reportedly told Johanna that he had all her money and did not need her anymore. Johanna reportedly said that she felt "stupid" because she believed that she and Lorenz were in a romantic relationship.

The siblings and copersonal representatives also presented a report from the Department, dated December 1, 2010, determining that Johanna was considered a vulnerable adult because she had lacked capacity and been "unable to make complex medical and financial decisions since October 23, 2009," based on a letter by her physician, Morgan, dated

September 29, 2010. The report also detailed the investigation the Department performed based on three "intakes" it received alleging that Lorenz was financially exploiting Johanna. The report stated that in the month before Wilson's death, Wilson (while in hospice care) signed documents removing himself as the beneficiary of a life insurance policy on Johanna and making Lorenz the new beneficiary. Wilson also made Lorenz the new beneficiary for one of his annuities. The Department's report also notes that in March 2010, about 4 months after Wilson died, a total of $38,000 was taken out of Johanna's bank accounts.

During a Department interview with Lorenz, he stated that Johanna bought him a $41,000 boat in March 2010 in appreciation for all the things he had done for her. He also disclosed that Johanna and Wilson gave him one of their cars and that he is keeping their other car at his house and had himself "added as" an owner of the car to lower the insurance rates. The report also states that there were "multiple questionable cash withdrawals from Johanna's accounts and shifting of monies from one account to another and to new accounts." The Department found the allegations of financial exploitation by Lorenz against Johanna to be substantiated. The Department sent Lorenz a letter on December 7, 2010, informing him of its finding and notifying him that his name would be entered in the "Adult Protective Services . . . Central Registry." The registry contains names of perpetrators of reported abuse or neglect of vulnerable adults, which reports have been substantiated through investigation.

An affidavit of Malousek, the guardian-conservator of Johanna, was entered into evidence. The affidavit states that in December 2010, after Malousek's appointment as temporary guardian-conservator, he received a telephone call from an attorney who told him that Lorenz brought Johanna to his office seeking his services in drafting a power of attorney. The affidavit also states that Malousek had no knowledge of any preparation or execution of any will by Johanna dated March 11, 2011, which will was drafted by Peppard, and that Malousek gave no consent or authority to participate in any way in the drafting of any will during the entire time he was

temporary or permanent guardian-conservator for Johanna. Malousek also indicated that in his opinion as Johanna's guardian-conservator, her condition would have made her highly susceptible to undue influence.

Johanna told John C. Chatelain, the attorney who helped prepare her September 2010 will, that she was concerned that Lorenz had become involved in her financial affairs and was concerned about his access to her assets. Johanna was upset that Lorenz had been manipulating her accounts and told Chatelain that she did not want any of her assets to go to Lorenz. Chatelain stated in his affidavit that Lorenz had acquired an interest in Johanna's bank accounts, safe deposit box, cars, and certificates of deposit and also had become a beneficiary on certain life insurance policies.

Mary Elizabeth Keitel, a longtime friend and neighbor of Johanna's, stated in an affidavit that Lorenz adopted a pattern of trying to isolate Johanna from contact with her and her husband. Johanna told her on multiple occasions that Lorenz would get mad at Johanna if he found out she was socializing with them. Keitel also stated that Lorenz made it so that Johanna became more and more dependent upon him. In late August or early September 2010, Johanna told Keitel that Lorenz did not love her anymore and that she wanted him out of her life.

The evidence presented by the siblings and copersonal representatives also showed that Johanna had maintained a close relationship with her siblings through telephone calls and the mail, even though they came to visit her only twice in the preceding 40 years. Johanna's mother died when Johanna was a teenager, and her siblings then looked to Johanna as a mother figure who took care of them.

In opposition to the motion for partial summary judgment, Lorenz presented an affidavit of Gail D. Bierman, a friend of Johanna's since 2007 or 2008. Bierman stated that Johanna told her at some point that Johanna's brother and sisters had come for a visit and indicated to Johanna that they wanted her to either come live with one of them or be placed in some type of a "'home.'" Bierman indicated Johanna was furious as a result. Bierman also stated that during 2011, she never witnessed

anyone coerce, bully, threaten, intimidate, or otherwise influ-
ence Johanna. She stated she was aware that two neighbors
were trying to keep her away from Lorenz.

Lorenz also presented an affidavit of Peppard, the attorney
who prepared and helped Johanna execute the March 2011
will. Peppard stated that he first met with Johanna in October
2010 (the month following the September 2010 will). Lorenz
was present, and they discussed initiating a guardianship for
Johanna. Peppard stated that he represented Johanna in the
guardianship proceedings. He also stated that he represented
Lorenz in a meeting with the Department regarding an allega-
tion that Lorenz was taking advantage of Johanna as a vul-
nerable adult and also represented him in a meeting with the
Douglas County Attorney involving the same allegations.

Lorenz also offered answers to interrogatories from each
of Johanna's three siblings. Roessler, Johanna's brother, con-
firmed in his interrogatory answers that Johanna and her sib-
lings were close and recounted several experiences they have
shared that made them close. All three siblings indicated that
they had regular communication with Johanna.

Both parties asked the court to take judicial notice of the
transcript from the guardianship proceedings. The transcript
was marked as an exhibit and is in the record before us.

On April 24, 2013, following the hearing, the court granted
partial summary judgment in favor of the siblings, finding that
there were no genuine issues of material fact as to whether the
March 2011 will was a result of Lorenz' undue influence, and
declared the will to be of no force and effect.

On May 2, 2013, the siblings and copersonal representa-
tives filed a motion for summary judgment asking the court
to declare Lorenz' objection to probate of the September 2010
will to be without merit and to declare the will valid. Lorenz
filed an objection to the motion for summary judgment and
also filed a motion to alter or amend the court's April 24 order
granting partial summary judgment.

A summary judgment hearing was held on May 13, 2013,
and in support of the motion, the siblings offered a supple-
mental affidavit of Chatelain, affidavits of their own, and affi-
davits of the Thompsons. The evidence showed that Chatelain

met Johanna's siblings for the first time on September 27, 2010, and that he had no communication with them prior to that date. Chatelain also stated that in drafting the September 2010 will, all matters were between him and Johanna and did not involve Johanna's siblings.

Chatelain and the Thompsons all indicated that the Thompsons did not participate in the preparation or execution of Johanna's September 2010 will and did not communicate with Chatelain regarding any matter or provision that should be contained in the will.

The evidence also shows that the siblings came to visit Johanna on September 26, 2010, after receiving a telephone call from Kathleen Thompson, who indicated she was concerned about Johanna's well-being and safety based on Lorenz' involvement in her life. The siblings had no knowledge of the will executed on September 13, 2010, or of its making or its contents, until meeting with Chatelain on September 27. During their visit, the siblings also met with Johanna's physician, who recommended that Johanna move to an assisted living facility. Johanna made it clear to her siblings that she wanted to continue living in her own home.

Lorenz offered his own affidavit and answers to interrogatories from the Thompsons. All of the exhibits entered into evidence at the hearing on the motion for partial summary judgment were entered into evidence at the May 13, 2013, hearing as well.

Following the hearing, the court entered an order on May 23, 2013, denying Lorenz' motion to alter or amend the court's April 24 order and granting summary judgment in favor of the siblings and copersonal representatives, finding that the September 2010 will "was validly executed and allowed to [be] probate[d]."

## ASSIGNMENTS OF ERROR

Lorenz assigns that the trial court erred in granting partial summary judgment in favor of the siblings and copersonal representatives in April 2013; in invalidating the March 2011 will; and in granting summary judgment in favor of the

siblings and copersonal representatives in May 2013, finding the September 2010 will to be Johanna's final will.

## STANDARD OF REVIEW

[1,2] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Klingelhoefer v. Parker, Grossart*, 20 Neb. App. 825, 834 N.W.2d 249 (2013). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all favorable inferences deducible from the evidence. *Id.*

## ANALYSIS

*Partial Summary Judgment Regarding*
*March 2011 Will.*

Lorenz first challenges the partial summary judgment entered in April 2013 in favor of the siblings and copersonal representatives, in which judgment the court found that the March 2011 will was of no force and effect. He argues that the trial court erred in concluding that no genuine issue of material fact existed as to whether he exercised undue influence over Johanna, inducing her to execute the March 2011 will making him the only beneficiary. Before proceeding with the analysis, we set forth some general principles regarding summary judgment and undue influence.

[3-5] The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Durre v. Wilkinson Development*, 285 Neb. 880, 830 N.W.2d 72 (2013). After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id.*

If a genuine issue of fact exists, summary judgment may not properly be entered. *Id*.

[6-8] To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence; (2) there was an opportunity to exercise such influence; (3) there was a disposition to exercise such influence; and (4) the result was clearly the effect of such influence. *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). Yet not every exercise of influence will invalidate a will. *Id*. Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's. *Id*.

[9,10] But it is not necessary for a court in evaluating the evidence to separate each fact supported by the evidence and pigeonhole it under one or more of the above four essential elements. The trier of fact should view the entire evidence and decide whether the evidence as a whole proves each element of undue influence. *Id*. And a party seeking to prove the exercise of undue influence is entitled to all reasonable inferences deducible from the circumstances proved. *Id*.

[11,12] One does not exert undue influence in a crowd. It is usually surrounded by all possible secrecy; it is usually difficult to prove by direct evidence; and it rests largely on inferences drawn from facts and circumstances surrounding the testator's life, character, and mental condition. *Id*. In determining whether undue influence existed, a court must also consider whether the evidence shows that a person inclined to exert improper control over the testator had the opportunity to do so. *Id*. Thus, the Nebraska Supreme Court has recognized a presumption of undue influence if the contestant's evidence shows a confidential or fiduciary relationship, coupled with other suspicious circumstances. *Id*.

[13] The Nebraska Supreme Court has previously summarized suspicious circumstances that, when coupled with proof of a confidential or fiduciary relationship, can give rise to a presumption of undue influence. Those circumstances include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an

elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary. *Id*.

Having set forth the law applicable to this case, we now turn to the evidence of undue influence in the present case to determine whether a genuine issue of material fact exists.

We first note the relationship between Johanna and Lorenz. Lorenz had helped out Johanna and Wilson in various ways over multiple years and had established a relationship with Johanna. Lorenz claims to have been like a son to Johanna. However, there was also evidence that Johanna believed she and Lorenz were in a romantic relationship. Either way, Lorenz had more than sufficient opportunity to exercise his influence over Johanna concerning her assets and estate planning. He prepared her taxes and acted at times as a financial advisor. Further, Lorenz held powers of attorney for Johanna and Wilson.

Keitel, Johanna's longtime friend and neighbor, indicated that Lorenz tried to isolate Johanna from contact with Keitel and her husband and indicated that Lorenz would get mad if he found out Johanna was socializing with Keitel and her husband. Keitel also stated that Lorenz made it so that Johanna became more and more dependent upon him.

The evidence also established that Johanna was in a weakened mental condition and subject to undue influence by Lorenz at the time the March 2011 will was executed. Johanna began showing signs of dementia in 2009. Malousek, Johanna's temporary guardian in March 2011, stated that her condition would have made her highly susceptible to undue influence. In October 2010, Pare, in her neurophysiological evaluation of Johanna, came to the same conclusion. She concluded that Johanna had the capacity to make her own medical and financial decisions, but found her to be a vulnerable adult at risk of being financially exploited by Lorenz. Further, following an investigation by the Department, it concluded that the allegations of financial exploitation by Lorenz against Johanna were substantiated and that Johanna was being abused as a

vulnerable adult by Lorenz. The Department notified Lorenz of its findings and filed a guardianship-conservatorship petition on Johanna's behalf to protect her and her assets. Lorenz filed a similar petition asking that he be named Johanna's guardian-conservator.

The evidence also shows that Lorenz had acquired an interest in Johanna's bank accounts, safe deposit box, and certificates of deposit and had become a beneficiary on certain life insurance policies. Johanna also gave him $41,000 to buy a boat, and he had acquired the Morrells' cars. Lorenz did not challenge any of this evidence. These actions indicate that he was predisposed to having himself named the beneficiary of her entire estate.

Johanna indicated to Chatelain, the attorney who prepared and executed the September 2010 will, that she was concerned that Lorenz had become involved in her financial affairs and was concerned about his access to her assets. Johanna was upset that Lorenz had been manipulating her accounts and told Chatelain that she did not want any of her assets to go to Lorenz.

Further, the March 2011 will was prepared and executed without the knowledge of the duly appointed and acting guardian-conservator. Malousek stated in his affidavit that he had no knowledge of any preparation or execution of the March 2011 will and that he gave no consent or authority to participate in any way in the drafting of any will during the time he was temporary or permanent guardian-conservator for Johanna.

The siblings and copersonal representatives' evidence established that the March 2011 will was the product of Lorenz' undue influence as a matter of law. The burden shifted to Lorenz to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. See *Durre v. Wilkinson Development*, 285 Neb. 880, 830 N.W.2d 72 (2013). We conclude that Lorenz did not satisfy his burden.

Lorenz offered into evidence an affidavit of Bierman, a friend of Johanna's, who stated that during 2011, she never

witnessed anyone coerce, bully, threaten, intimidate, or otherwise influence Johanna.

Lorenz also presented an affidavit of attorney Peppard, which states that Peppard first met Johanna in October 2010, when Lorenz brought Johanna to Peppard's office and the three of them discussed Lorenz' becoming Johanna's guardian-conservator. Lorenz subsequently filed a petition for appointment of guardian-conservator that was prepared and submitted by Peppard. Peppard's affidavit also states that he represented Lorenz in regard to the allegations being investigated by the Department. Peppard was the same attorney who prepared and helped Johanna execute the March 2011 will. Therefore, the admission of Peppard's affidavit shows that Peppard had represented both Johanna and Lorenz, indicating that Johanna did not have advice from an independent attorney when she executed the March 2011 will. As the trial court found, Lorenz, through his attorney Peppard, sought to influence Johanna into changing her will.

Lorenz' evidence also establishes that despite Peppard's knowing about the Department's investigation into Lorenz' financial exploitation of Johanna and despite a temporary guardian-conservator's having been appointed, Peppard imprudently drafted and executed the March 2011 will for Johanna, giving all of her estate to the very person whom the Department was trying to protect her from. We find this conduct by a Nebraska lawyer to be deeply troubling.

The answers to interrogatories from each of Johanna's siblings simply showed that Johanna and her siblings all had a good relationship and stayed in regular contact with each other.

In summary, the evidence showed that Lorenz had the opportunity to exercise influence over Johanna and that she was susceptible to such undue influence at the time the March 2011 will was executed. Lorenz tried to isolate Johanna from her friends and had manipulated her assets such that he had acquired an interest in many of them. The Department concluded that Johanna was a vulnerable adult and that Lorenz was financially exploiting her. Further, the March 2011 will

was not drafted by independent counsel, but, rather, by the same attorney who represented Lorenz in regard to the allegations investigated by the Department. The March 2011 will was also executed without the knowledge of Johanna's court-appointed guardian-conservator. We find this evidence sufficient to establish that Lorenz exercised undue influence over Johanna, inducing her to execute the March 2011 will making him the sole beneficiary. The only evidence offered by Lorenz to counter this evidence was the Bierman affidavit stating she had never witnessed anyone exert undue influence over Johanna and the Peppard affidavit previously discussed. As explained above, undue influence is not exerted in public; therefore, we do not consider the Bierman affidavit to raise a genuine issue of material fact as to whether Lorenz exercised undue influence over Johanna in executing the March 2011 will. Nor do we consider Peppard's affidavit to raise a genuine issue of material fact as to this question, given the circumstances of his involvement with Lorenz. Therefore, while Lorenz may have presented evidence that created issues of fact, we find he failed to present evidence showing the existence of a genuine issue of material fact to prevent judgment as a matter of law. We conclude that the trial court did not err in sustaining the siblings' and copersonal representatives' motion for partial summary judgment, thereby invalidating the March 2011 will. Lorenz' first assignment of error is without merit.

*Summary Judgment Regarding*
*September 2010 Will.*

Lorenz next assigns that the trial court erred in granting summary judgment in favor of the siblings and copersonal representatives, finding there was no genuine issue of material fact as to whether the September 2010 will was validly executed.

Lorenz' objection to the probate of the September 2010 will was based on two distinct grounds. The first ground alleged that if the court invalidated or disallowed the probate of the March 2011 will based on Johanna's lack of testamentary capacity to validly execute the will, then the court should

invalidate or disallow the probate of the September 2010 will based on the same reasoning. Because the court's order granting partial summary judgment invalidates the March 2011 will on the basis of undue influence and not on the basis of lack of capacity, which invalidation we affirm, Lorenz' objection to probate of the September 2010 will on the basis of lack of capacity is not at issue.

Lorenz' second ground for objecting to the probate of the September 2010 will was that it resulted from "undue influence, duress and/or mistake on the part of [Johanna]." Lorenz argues that the siblings' unexpected visit in September 2010 creates a genuine issue of material fact as to whether the September 2010 will was the result of undue influence or duress by the siblings. Lorenz relies on the affidavits of Peppard and Bierman as evidence of the siblings' undue influence or duress.

Peppard's affidavit states Johanna told him at a meeting in October 2010, with Lorenz present, that her siblings came to visit her in September 2010 and that they had not come to visit her in the last 30 years. It stated that Johanna informed Peppard that her siblings "had taken her to an attorney, told her what to say, told her to sign the documents provided by the attorney and if she failed to follow their instructions they would remove her from her home and put her into a nursing home."

We note that Peppard's affidavit does not state that Johanna told him she was forced to sign a will, just "documents." The affidavit stated that when Peppard asked Johanna what she signed, she stated she did not know.

Bierman's affidavit states that Johanna told her that Johanna's siblings had come to visit her and indicated that they wanted her to go back to either live with them or be placed in some type of "'home.'" The affidavit further states that Johanna was furious and told her siblings to get out of her house.

Despite Peppard's and Bierman's affidavits, there is uncontradicted evidence that the September 2010 will was executed before the siblings came to visit Johanna. The will was executed on September 13, and the siblings arrived in Nebraska on September 26. The evidence shows that the siblings came

to visit Johanna after receiving a call from Kathleen Thompson indicating she was concerned about Johanna's well-being and safety. The siblings met Chatelain for the first time in his office on September 27 and, prior to that time, had no communication with him. The siblings had no knowledge of the will executed on September 13, or of its making or its contents, until meeting with Chatelain on September 27.

During the siblings' visit, there was some discussion about where Johanna should live. During the visit, the siblings met with Johanna's physician, who recommended that Johanna move to an assisted living facility. However, Johanna made it clear to her siblings that she wanted to continue living in her own home.

Further, although the siblings all lived on the east coast and visited Johanna only twice in the 40 years before her death, the evidence shows that she maintained a consistent relationship with them through telephone calls and through the mail. There was also evidence that Johanna had told both her neighbor Keitel and Chatelain that she wanted to give her property to her family.

We conclude that the siblings and copersonal representatives presented sufficient evidence to show that there was no genuine issue of material fact as to whether the September 2010 will was validly executed. The evidence showed that the September 2010 will was executed about 2 weeks before the siblings came to visit Johanna and that they came after receiving a call from Kathleen Thompson, who was concerned about Johanna. The attorney who assisted Johanna with the September 2010 will had no contact or communication with the siblings prior to their visit, and the siblings had no knowledge of the will or its contents prior to their visit. The evidence also showed that Johanna had a good relationship with her siblings, despite the lack of visits between them.

Although Lorenz offered affidavits from Peppard and Bierman which raised issues of fact regarding Johanna's future place of residence and unidentified legal documents, he did not meet his burden of showing a genuine issue of material fact as to the validity of the September 2010 will. Therefore,

Lorenz' assignment of error in regard to the September 2010 will is without merit.

## CONCLUSION

We conclude that the trial court did not err in granting partial summary judgment in favor of the siblings and copersonal representatives in April 2013; in invalidating the March 2011 will; and in granting summary judgment in favor of the siblings and copersonal representatives in May 2013, finding the September 2010 will to be Johanna's final will. Accordingly, we affirm the orders of the Douglas County Court entered on April 24 and May 23, 2013.

AFFIRMED.